IN THE UNITED STATES BANKRUPTCY COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | |
|---|---|
| In re: | : CHAPTER 11 |
| | : |
| **EDGMONT GOLF CLUB, INC.** | : BANKRUPTCY NO. 13-19358(SR) |
| | : |
| Debtor | : |
| | : |
| In re: | : CHAPTER 11 |
| | : |
| **EDGMONT COUNTRY CLUB** | : BANKRUPTCY NO. 13-19359(SR) |
| | : |
| Debtor | : |
| | : |

**DECLARATION OF PETER MARIANI
IN SUPPORT OF FIRST DAY MOTIONS**

I, Peter Mariani, hereby declare under penalty of perjury:

1. I am the chief financial officer of Edgmont Golf Club, Inc. (the "**Corporate Debtor**") and of Edgmont Country Club (the "**Operating Debtor**"), each a debtor and debtor in possession, in the above captioned Chapter 11 cases (the Corporate Debtor and the Operating Debtor are collectively referred to as the "**Debtors**"). In this capacity, I am generally familiar with the Debtors' day to day operations, businesses and financial affairs, and books and records.

2. On October 28, 2013 (the "**Petition Date**"), each of the Debtors filed a voluntary petition with the United States Bankruptcy Court for the Eastern District of Pennsylvania under chapter 11 of title 11 of the United States Code, 11 U.S.C. §§ 101 et. seq. (the "**Bankruptcy Code**"). The Debtors are operating their businesses and managing their property as debtors in possession pursuant to sections 1107(a) and 1108 of the Bankruptcy Code. Concurrently with the filing of this declaration (the "**Declaration**"), the Debtors have sought procedural and joint administration of these chapter 11 cases.

3. To enable the Debtors to minimize the adverse effects of the commencement of

these chapter 11 cases on their businesses, the Debtors have requested various types of relief in their "first day" motions and applications (each, a "**First Day Motion**"). The First Day Motions seek relief intended to allow the Debtors to effectively transition into chapter 11 and minimize disruption of the Debtors' business operations, thereby preserving and maximizing the value of the Debtors' estates.

4. I am familiar with the contents of each First Day Motion (including the exhibits and schedules thereto), and I believe that the relief sought in each First Day Motion: (a) is necessary to enable the Debtors to operate in chapter 11 with minimal disruption or loss of productivity and value; (b) constitutes a critical element to achieving a successful reorganization of the Debtors; and (c) best serves the Debtors' estates and creditors' interests. Except as otherwise indicated, all facts set forth herein are based upon my personal knowledge of the Debtors' operations and finances, information learned from my review of relevant documents, and information supplied to me by other members of the Debtors' management and the Debtors' advisors. I am authorized to submit this Declaration on behalf of the Debtors, and, if called upon to testify, I could and would testify competently to the facts set forth herein.

5. Part I of this Declaration describes the Debtors' businesses, their capital and corporate structures and the circumstances surrounding the commencement of these chapter 11 cases. Part II sets forth the relevant facts in support of each of the First Day Motions.[1]

---

[1] Capitalized terms used but not otherwise defined herein shall have the meanings ascribed to them in the relevant First Day Motion.

## BACKGROUND

A.  **Commencement of Chapter 11 Cases**

6.  On the Petition Date, each of the Debtors filed a voluntary petition with the United States Bankruptcy Court for the Eastern District of Pennsylvania under chapter 11 of title 11 of the Bankruptcy Code. The Debtors are operating their businesses and managing their property as debtors in possession pursuant to sections 1107(a) and 1108 of the Bankruptcy Code. Concurrently with the filing of this Declaration, the Debtors have sought procedural and joint administration of these chapter 11 cases.

B.  **The History of the Debtors' Golf Course and Business**

7.  The Corporate Debtor's real property was previously owned by the Sill family from 1719 to 1926. James Sill, son of John, inherited the 183 acre estate at the time of his father's death in 1774. A stone dated 1791 is preserved in the dining room floor of the Club house. Many families resided in the estate after the Sill Family including the Eisenhower's.

8.  Mr. and Mrs. Donald Barrows owned the estate in the early 1960's and sold it to a group organized by Tanino "Tiny" Pedone. Tiny was a golf pro who worked at Overbrook and Kimberton. He envisioned a top notch affordable private golf club for the average golfer. The Barrows estate was a perfect start for a course. Like many of the famous golf courses around the world the course was named after the local area "Edgmont, without the middle "e".

9.  Frank and Nazz Mariani of Nazz Mariani Company became partners in the project and constructed the course which started April of 1963. Nazz Mariani provided the needed excavation experience to carve the 18-hole golf course out of the rolling hills and wooded countryside along the picturesque Ridley Creek Valley. The site was perfect for a golf course,

with the former Mansion becoming the 7700 square foot club house and the stables becoming the Pro Shop and men's locker room.

10. The course opened for limited play on August 21, 1964 and opened to full play in April 1965. At approximately the same time, the Commonwealth of Pennsylvania purchased the land adjacent to the Club which was to become the 2600 acre Ridley Creek State Park. The Park provided a breathtaking back drop, free of housing developments, for the golfer and social visitor alike.

11. In 1997, a banquet facility seating 200 persons was added and the club hosts many golf outings, charity auctions, wedding receptions, business meetings and other special events.

12. The course was substantially renovated starting in 2004. The irrigation system was replaced with a wireless computer controlled system. The cart paths were replaced, widened and lengthened and all of the sand traps were updated.

13. The Edgmont Country Club has always been very active in using golf to help charities. In 1967 Bob Hope visited for a benefit for blind golfers. Since 1978 it has been the home for the Edgmont Classic which benefits the Arthritis Foundation and starting in 2005 has been benefiting local branches of the Special Olympics. In 2007 the United States Blind Golf Association (USBGA) held its 62 National Championship at Edgmont. This was the 40th anniversary of the Bob Hope for the blind tournament. In 2010 the United States Blind Golf Association (USBGA) returned to hold its 65 National Championship at Edgmont.

14. The country club is operated as a private club. The club is located at 5180 West Chester Pike, Edgemont, Delaware County, Pennsylvania, 19028, with a small portion of the

property extending into Willistown Township, Chester County. The total acreage is approximately 190 acres.

15. There are no capital assessments or house minimums and three levels of non-equity memberships are available as follows.

    a. Social members can use the driving range, dining and bar facilities but have no golf privileges. The social member also has a house charge and is billed monthly. The room rental fee for parties and meetings is waived.

    b. Green card members have all of the privileges of social members plus full golf privileges. Green card members pay green fees for each round of golf.

    c. Gold card members have all of the privileges of green card members but do not pay green fees each time they play.

16. Since its inception, the course has been owned and operated by the Mariani family.

    C.    **The Debtors' Corporate Structure**

17. The Corporate Debtor is a Pennsylvania corporation. The shares of the Corporate Debtor are owned equally by Phyllis Ann Mariani a/k/a Pam Mariani and the Frank J. Mariani Trust. Pam Mariani is the general manager and Peter Mariani is the chief financial officer.

18. The Operating Debtor is an affiliate of the Corporate Debtor in that it is owned by the same shareholders and has the same officers as the Operating Debtor.

19. The Corporate Debtor owns the real estate, furniture, fixtures and equipment. The Operating Debtor owns the liquor license and operates the country club. The assets of the Operating Debtor are comprised of accounts receivable, inventory and the liquor license.

D. **The Debtors' Capital Structure**

20. As of the Petition Date, the Debtors' had secured obligations of approximately $2.3 million comprised of three credit facilities from PNC Bank, N.A. as follows:

a. A term note dated October 2005 (the "First Term Note"), in the original principal amount of $2,200,000, with a current principal balance due of $1,726,164;

b. A line of credit note dated November 2005 (the "Line"), in the original principal amount of $500,000, with a current principal balance due of $500,000;

c. A term note dated July 2010 (the "Second Term Note"), in the original principal amount of $100,000, with a current principal balance due of $54,249.

21. The First Term Note, the Line and Second Term Note are secured by the real property owned by the Corporate Debtor.

22. As of the Petition Date, the Debtors' had secured obligations of approximately $228,543 comprised of two commercial finance lease agreements (the "Lease Finance Agreements") due to PNC Equipment Finance LLC ("PNCEF") as successor in interest to National City Bank. The Lease Finance Agreements are secured by certain golf carts.

23. The Debtors also have unpaid real estate taxes of approximately $266,000 and approximately $160,000 of unsecured trade payables.

E. **Events Leading to a Chapter 11 Filing**

24. Over the past few years, the Debtors have experienced a working capital shortage resulting primarily from the economic downturn which caused a decrease in the number of members and reduced play of the golf course which has resulted in lower revenues. As a result of the lower revenues, the Debtors encountered significant challenges in servicing their secured debt and timely paying their vendors.

6

25. On or about January 18, 2013, PNC Bank, N.A., confessed judgment against the Debtors in the Court of Common Pleas, Delaware County in the amount of $2,732,334.69. By order dated October 23, 2013, the Debtors Petition to have the Confessed Judgment stricken or opened was denied by the Court of Common Pleas.

26. The Debtors are also facing a number of collection complaints.

27. As a result of the above stated actions by creditors, the Debtors were placed in the untenable position of potentially having certain of their assets subject to execution to satisfy the claims of PNC Bank, N.A. and/or unsecured creditors. The Debtors decided to file for Chapter 11 protection to preserve their going concern value and to reorganize.

## First Day Motions

I. **Procedural Motions**

    A. **Motion of the Debtors for an Order Directing Joint Administration of Their Related Chapter 11 Cases**

28. The Debtors in these chapter 11 cases are affiliated entities. The Corporate Debtor and the Operating Debtor have the same shareholders and officers. The Debtors request that, in light of the fact that Corporate Debtor and Partnership Debtor have each filed petitions in this Court, the Court can and should jointly administer these chapter 11 cases. I believe that jointly administering these chapter 11 cases: (a) will ease the administrative burden on the Court and the parties; (b) will protect creditors of different estates; and (c) will simplify the United States Trustee's supervision of the administrative aspects of the chapter 11 cases. Accordingly, I believe that joint administration is in the best interests of the Debtors' estates.

B.   **Professional Retention and Related Motions**

**Debtors' Application for an Order Approving the Retention of Maschmeyer Karalis P.C. as Bankruptcy Counsel Pursuant to 11 U.S.C. § 327(a)**

29.   The Debtors seek to retain Maschmeyer Karalis P.C. ("**MK**") as bankruptcy counsel pursuant to section 327(a) of the Bankruptcy Code as their attorneys because MK has extensive experience and knowledge in the field of debtors' and creditors' rights and business reorganizations under chapter 11 of the Bankruptcy Code. In addition, I believe MK possesses extensive expertise, experience, and knowledge practicing before bankruptcy courts.

30.   In preparing for its representation of the Debtors in these cases, MK has become familiar with the Debtors' businesses and affairs and many of the potential legal issues which may arise in the context of these chapter 11 cases.

31.   I believe that the employment of MK is appropriate and necessary to enable the Debtors to faithfully execute their duties as debtors and debtors-in-possession, and to implement the restructuring and reorganization of the Debtors. Accordingly, I believe that MK is both well-qualified and uniquely able to represent the Debtors in the chapter 11 cases in an efficient and timely manner.

C.   **Operational Motions**

**Motion of Debtors for an Order Pursuant to 11 U.S.C. 363(c) and Fed.R.Bankr.P. 4001, Authorizing the Debtors to Use Cash Collateral and Provide Adequate Protection**

32.   The Debtors require the ability to use cash and the proceeds of existing accounts receivable to maintain the operation of their business and preserve its value as a going concern.

33.   Certain of the PNC loan documents reflect a grant of a security interest in accounts. However, the Debtors' search has revealed no recorded UCC-1 financing statement in favor of PNC Bank that includes accounts. Therefore, it appears that PNC Bank

N.A. does not hold a perfected security interest in the Debtors' accounts and therefore no interest in cash collateral.

34. This issue has been raised with counsel for PNC Bank, N.A. and may be resolved prior to the date of the hearing.

35. However, out of an abundance of caution, in the event that the accounts may constitute part of PNC Bank's collateral and, therefore, may not be used in support of the Debtors' ongoing business activities absent compliance with Section 363 of the Bankruptcy Code or the consent of PNC Bank, the Debtors have filed a Motion to seek authority to use cash collateral.

36. In accordance with Section 363 of the Bankruptcy Code, the Debtors requests that the Court authorize the Debtors' use of Cash Collateral for an interim period, pending a final hearing on the Debtor's use of Cash Collateral.

37. If applicable, the Debtors request authority to use cash collateral in the amount to be set forth on a budget which will be presented to PNC Bank and will be submitted to the Court on or before the hearing date for the cash collateral Motion. The use of cash collateral is necessary in order for the Debtors to be able to operate and pay their post-petition obligations as they come due.

**Motion of Debtors for an Order (A) Authorizing the Operating Debtor to Pay Certain Pre-Petition (I) Wages, Salaries, and Other Compensation, (II) Reimbursable Employee Expenses, and (III) Employee Medical And Similar Benefits; (B) Confirming that the Operating Debtor May Continue Pre-Petition Employee Programs in the Ordinary Course of Business; and (C) Directing Banks and Other Financial Institutions to Honor all Related <u>Checks and Electronic Payment Requests</u>**

38. As of the Petition Date, the Operating Debtor employed approximately fifty (50) employees (the "**Employees**"). There are fifteen (15) full-time Employees and thirty-five (35) part-time Employees. The Corporate Debtor has no Employees.

39. The Employees perform a variety of critical functions including operating and maintaining the golf course, customer service, purchasing, sales, credit, finance, accounting, human resources, marketing, management, and other tasks. The Employees' skills and their knowledge and understanding of the Operating Debtor's operations, customer relations, and infrastructure are essential to the Operating Debtor's business.

40. Just as the Operating Debtor depends on its Employees to operate, the Employees depend on the Operating Debtor. The vast majority of the Operating Debtor's Employees rely exclusively on their compensation and benefits to continue to pay their daily living expenses, and these Employees will be exposed to significant financial difficulties if the Operating Debtor is not permitted to pay them their full unpaid compensation, benefits, and reimbursable expenses in the ordinary course of business.

41. To minimize the personal hardship that the Employees would suffer if pre-petition Employee-related obligations are not paid when due or as expected, and to maintain morale and stability in the Operating Debtor's workforce during this critical time, the Operating Debtor, by this Motion, seeks authority to pay and honor, in its sole discretion, certain pre-petition claims for, among other items: wages, salaries, and other compensation, expense reimbursement, federal and state withholding taxes and other amounts withheld (including, garnishments, Employees' share of insurance premiums and taxes), health insurance, and all other benefits that the Operating Debtor has historically provided in the ordinary course of business (collectively, and as more fully described below, the "**Employee Obligations**") and to pay all costs incident to the foregoing. In an abundance of caution, the Operating Debtor requests the right to modify, change, and discontinue any of its employee compensation, programs, policies and benefits, and to implement new

programs, policies and benefits in the ordinary course of business during the Chapter 11 Case in its sole discretion without the need for further Court approval.

      (i)      <u>Employees, Programs and Benefits</u>

      (ii)     Employee Obligations

           a.     <u>Unpaid Compensation</u>

42. In the ordinary course of business, the Operating Debtor incurs payroll obligations to the Employees. Such obligations generally comprise wages and salaries, but may also include expense reimbursement.

43. The Operating Debtor generally pays its Employees periodic payments for wages and salaries weekly every Friday. They are paid one week in arrears. However, because the employees are paid by direct deposits into their individual bank accounts, the payroll is funded on Thursday of each week. The next payroll is scheduled to be paid on October 31, 2013 for the one week period from October 21, 2013 to October 27, 2013.

44. On average, the Operating Debtor has gross wages and salaries of approximately $15,000 during each pay period. The Operating Debtor utilizes a payroll company, Heartland Payroll, to process its payroll. The Operating Debtor is responsible for paying all the withholdings and payroll taxes (discussed below) to the applicable third parties.

45. Because all of the Employees are paid in arrears, as of the Petition Date, the Employees may not have been paid all of their pre-petition wages and compensation. Additionally, some Employees may be entitled to compensation because some checks issued to Employees prior to the Petition Date may not have been presented for payment or may not have cleared the banking system and, accordingly, have not been honored and paid as of the Petition Date (the "**Uncashed Checks**").

46. The Operating Debtor estimates that, as of the Petition Date, approximately $13,455 in pre-petition accrued wages and salaries earned prior to the Petition Date remains unpaid (the "**Unpaid Compensation**"). The pre-petition wages of Pam Mariani total approximately $650. As of the Petition Date, the Operating Debtor believes that there may be uncashed payroll and employee reimbursement checks. The Operating Debtor seeks authority, but not direction, to pay the Unpaid Compensation, along with any costs associated therewith.

47. The Operating Debtor submits that no employee has Unpaid Compensation in excess of the $12,475.00 statutory priority cap imposed by sections 507(a)(4) and (5) of the Bankruptcy Code. Accordingly, payment of Unpaid Compensation to the Employees would not violate the statutory priority afforded wages, salaries and other forms of compensation, but would merely accelerate its payment.

48. To the extent any other Unpaid Compensation exceeds the statutory priority cap imposed by sections 507(a)(4) and (5) of the Bankruptcy Code, such payments would be de minimis. Nonetheless, the Operating Debtor is not hereby seeking authority to pay any of the Employees on account of pre-petition accrued wage or benefit obligations in excess of the $12,475.00 priority cap.

        b. <u>Deductions and Withholdings</u>

49. During each applicable pay period, the Operating Debtor routinely deducts certain amounts from Employees' paychecks, including, without limitation, (a) garnishments, child support, and similar deductions, and (b) other pre-tax and after-tax deductions payable pursuant to the Employee benefit plans (such as an Employee's share of health care benefits and insurance premiums (collectively, "**Deductions**"). The Operating Debtor forwards the amount of the Deductions to the appropriate third-party recipients. Due to the

12

commencement of the Chapter 11 Cases, however, certain Deductions that were deducted from Employees' earnings may not have been forwarded to the appropriate third-party recipients prior to the Petition Date. Accordingly, the Operating Debtor requests authority, but not direction, to forward any unpaid Deductions to the appropriate third party recipients and to continue to forward these pre-petition Deductions to the applicable third party recipients on a post-petition basis, in the ordinary course of business as routinely done prior to the Petition Date. The Operating Debtor also requests authority, but not direction, to honor pre-petition checks associated with employee benefits.

50. Further, the Operating Debtor is required by law to withhold from an Employee's wages amounts related to federal, state and local income taxes, Social Security and Medicare taxes for remittance to the appropriate federal, state, or local taxing authority (collectively, the "**Withheld Amounts**"). The Operating Debtor must then pay social security and Medicare taxes and pay, based on a percentage of gross payroll, additional amounts for federal and state unemployment insurance (collectively, the "**Employer Payroll Taxes**").

51. Prior to the Petition Date, the Operating Debtor withheld the appropriate amounts from Employees' earnings for the Withheld Amounts and the Employer Payroll Taxes (collectively, the "**Payroll Taxes**"), but such funds may not yet have been forwarded to the appropriate taxing authorities. The Operating Debtor requests authority, but not direction, to forward any outstanding Payroll Taxes to the appropriate third parties, and to continue to honor and process the pre-petition payments for Payroll Taxes on a post-petition basis, in the ordinary course of business, as routinely done prior to the Petition Date.

            c.      <u>Honoring Checks for, and Payment of, Reimbursable Expenses</u>

52. Prior to the Petition Date and in the ordinary course of its operations, the Operating Debtor reimbursed Employees for certain reasonable and customary expenses incurred on behalf of the Operating Debtor in the scope of their employment (the "**Reimbursable Expenses**"). The Reimbursable Expenses include organization-related expenses that are paid by the Employees. As of the Petition Date, the Operating Debtor believes that there are no pending requests for expense reimbursement. However, it is possible that certain Employees may have incurred pre-petition expenses for which they have not yet submitted requests for reimbursement and will submit such requests to the Operating Debtor after the Petition Date.

53. Reimbursable Expenses are all incurred on the Operating Debtor's behalf and with the understanding that they will be reimbursed. Accordingly, to avoid harming Employees who may have incurred the Reimbursable Expenses, the Operating Debtor requests authority, to be exercised in its sole discretion, to (a) continue paying Reimbursable Expenses in accordance with pre-petition practices, (b) modify its pre-petition policies relating thereto as they deem appropriate, and (c) pay all Reimbursable Expenses that relate to the pre-petition period and are submitted to the Operating Debtor post-petition.

            (iii)      <u>Employee Benefits</u>

54. The Operating Debtor offers Employees the ability to participate in a health insurance program and a 401(k) plan (collectively, the "**Employee Benefit Programs**").

            a.      <u>Medical</u>

55. The Operating Debtor offers third party carrier health insurance to its management Employees for medical coverage (the "**Health Insurance**"). The Health Insurance coverage costs the Operating Debtor approximately $120,000 per year.

b.    <u>401(k) Plan</u>

56.    The Operating Debtor maintains a traditional 401(k) retirement plan meeting the requirements of the Internal Revenue Code for the benefit of its full-time management Employees (the "Retirement Plan"). The Retirement Plan allows for deductions of eligible compensation up to the limits set by the Internal Revenue Code.

57.    By this Motion, the Operating Debtor seeks authority, in its sole discretion, to (a) continue the Health Insurance for its Employees in the ordinary course of business, (b) continue making contributions to such benefit programs, and (c) pay any amounts related thereto, including on account of any premiums, claim amounts, and administration fees to the extent that they remain unpaid as of the Petition Date.

**B.    Motion for Entry of Interim and Final Orders: Prohibiting Utility Companies from Discontinuing, Altering or Refusing Services; (II) Deeming Utility Companies To Have Adequate Assurance of Payment; and (III) Establishing Procedures for Determining Requests for Additional Assurance Pursuant to 11 U.S.C. § 366**

58.    In connection with the operation of their businesses, the Debtors obtain electric, water, telephone, internet and other similar utility services provided by a number of utility companies (the "**Utility Companies**").

59.    Preserving utility services on an uninterrupted basis is essential to the Debtors' ongoing operations and, therefore, to the success of their reorganization. Indeed, any interruption of utility services, even for a brief period of time, would disrupt the Debtors' operations. Such a result could seriously jeopardize the Debtors' reorganization efforts and, ultimately, their enterprise value and creditor recoveries. It is, therefore, critical that utility services continue uninterrupted during these chapter 11 cases.

**[SIGNATURE PAGE TO FOLLOW]**

Date: October 28, 2013

By: _____
Peter Mariani   CFO