**IN THE UNITED STATES BANKRUPTCY COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA**

_____

| | | |
|---|---|---|
| **In re:** | : | **CHAPTER 11** |
| | : | |
| **EDGMONT GOLF CLUB, INC.** | : | **BANKRUPTCY NO. 13-19358(SR)** |
| | : | |
| **Debtor** | : | |
| _____ | : | |
| **In re:** | : | **CHAPTER 11** |
| | : | |
| **EDGMONT COUNTRY CLUB** | : | **BANKRUPTCY NO. 13-19359(SR)** |
| | : | |
| **Debtor** | : | |
| _____ | : | |

_____

**JOINT DISCLOSURE STATEMENT IN RESPECT OF
JOINT PLAN OF REORGANIZATION
PROPOSED BY DEBTORS-IN-POSSESSION**

_____

***[THIS IS NOT A SOLICITATION OF ACCEPTANCE OR REJECTION
OF THE PLAN.  ACCEPTANCES OR REJECTIONS MAY NOT BE SOLICITED
UNTIL A DISCLOSURE STATEMENT HAS BEEN APPROVED BY THE UNITED
STATES BANKRUPTCY COURT.  THIS DISCLOSURE STATEMENT  IS BEING
SUBMITTED FOR APPROVAL, BUT HAS NOT BEEN APPROVED BY
THE UNITED STATES BANKRUPTCY COURT]***

Aris J. Karalis, Esquire
MASCHMEYER KARALIS P.C.
1900 Spruce Street
Philadelphia, PA 19103
(215) 546-4500
Dated: February 27, 2015          Attorneys for the Debtors

# TABLE OF CONTENTS

**PAGE NO.**

1.   INTRODUCTION ..........................................................................................................1

2.   SUMMARY OF PLAN ................................................................................................1

3.   DISCLAIMERS ..........................................................................................................2

4.   INFORMATION ABOUT THE REORGANIZATION PROCESS ...................................3

    4.1   Brief Explanation of Chapter 11 .........................................................................3
    4.2   Purpose of Disclosure Statement .........................................................................3
    4.3   Notice to Holders of Claims and Interests ...........................................................4
    4.4   Solicitation Package...........................................................................................4
    4.5   Eligibility to Vote .............................................................................................4
    4.6   General Voting Procedures and Voting Deadline..................................................6
    4.7   The Confirmation Hearing ..................................................................................7
    4.8   Acceptances Necessary to Confirm Plan ..............................................................7
    4.9   Confirmation of the Plan Without the Necessary Acceptances ..............................7

5.   BEST INTEREST OF CREDITORS AND COMPARISON WITH CHAPTER
    LIQUIDATION ..........................................................................................................8

    5.1   Best Interest to Creditors ...................................................................................8
    5.2   Sources and Uses of Funds .................................................................................9

6.   GENERAL INFORMATION ........................................................................................9

    6.1   Overview of the Real Property and Country Club.................................................9
    6.2   The Debtors' Corporate Structure .....................................................................10
    6.3   Debtors' Assets as of the Petition Date ..............................................................10
    6.4   The Debtors' Prepetition Debt...........................................................................10
    6.5   Events Leading to the Chapter 11 Filings...........................................................11
    6.6   Bankruptcy Proceeding ....................................................................................11
    6.7   Post-Confirmation Officers and Directors; Compensation...................................12

7.   THE PLAN ..............................................................................................................13

    7.1   Classes of Claims and Interests.........................................................................14
    7.2   Unclassified Claims .........................................................................................14
    7.3   Estimation of Classes of Claims .......................................................................15
    7.4   Treatment of Claims and Interests .....................................................................16
        Edgmont Golf Club, Inc......................................................................................16
            Class 1A.  Secured Claim of Property Tax Liens .......................................16

   Class 1B.  Secured Claim of PNC Bank .................................................17
   Class 1C.  Priority Non-Tax Claims .....................................................19
   Class 1D.  General Unsecured Claims ...................................................19
   Class 1E.  Interest Holders ....................................................................19
  Edgmont Country Club. ...............................................................................19
   Class 2A.  Secured Claim of PNC Bank ...............................................19
   Class 2B.  Priority Non-Tax Claims .....................................................20
   Class 2C.  General Unsecured Claims ...................................................20
   Class 2D.  Interest Holders ....................................................................21

8.  PROVISIONS FOR EXECUTION OF THE PLAN ...........................................21

  8.1  Revesting of Assets ...............................................................................21
  8.2  Post-Confirmation Operations of Country Club ...................................21
  8.3  Sale of Real Property ............................................................................21
  8.4  Payment of Deposit ..............................................................................21
  8.5  Sale of Real Property is Free and Clear of Liens, Claims and Interests ...............22
  8.6  Disbursements and Investment of Funds ..............................................23
  8.7  Final Decree ..........................................................................................23
  8.8  Continued Existence of the Debtors ......................................................23
  8.9  Corporate Action ...................................................................................23
  8.10 Effectuating Documents and Further Transactions ...............................23
  8.11 Post-Confirmation Officer and Director; Compensation ......................24
  8.12 Preservation of Insurance .....................................................................24
  8.13 Transactions under the Sale Agreement are Transfers Under the Plan ...............24
  8.14 Exemption from Transfer Taxes ............................................................24
  8.15 Execution of Documents Extinguishing Liens .....................................25

9.  GENERAL PROVISIONS ...............................................................................25

  9.1  Assumed Executory Contracts and Unexpired Leases ..........................25
  9.2  Rejected Executory Contracts and Unexpired Leases ...........................25
  9.3  Payments Related to Assumption of Executory Contracts or Unexpired Leases ...25
  9.4  Rejection Damages Bar Date ................................................................26
  9.5  Objections to Claims; Prosecution of Disputed Claims .........................26
  9.6  Late Filed Claims .................................................................................26
  9.7  No Distributions Pending Allowance ....................................................26
  9.8  Reserve for Disputed Unsecured Claims ...............................................26
  9.9  Estimation Period ..................................................................................27
  9.10 Distributions After Allowance ..............................................................27
  9.11 Objection Deadline ...............................................................................27
  9.12 Retention, Enforcement and Waiver of Claims .....................................27
  9.13 Powers ...................................................................................................27
  9.14 Discharge of Debtors ............................................................................27
  9.15 Discharge of Claims; Injunction ...........................................................28
  9.16 Effect of Confirmation Order ................................................................28

9.17    Automatic Stay..................................................................................................28
9.18    Modification and Amendments..........................................................................28
9.19    Right to Revoke or Withdraw ...........................................................................28
9.20    Effect of Withdrawal, Revocation, or Non-Consummation ...................................28
9.21    Liability in Connection with Plan .......................................................................29
9.22    Exculpation ......................................................................................................29
9.23    Remedy of Technical Defects ...........................................................................29
9.24    Surrender and Cancellation of Instruments.........................................................29

10.    CONDITIONS PRECEDENT TO CONFIRMATION AND EFFECTIVE DATE .........30

10.1    Conditions Precedent to Confirmation..............................................................30
10.2    Conditions Precedent to the Occurrence of the Effective Date ...........................30
10.3    Waiver of Conditions to Occurrence of Effective Date or Confirmation ..............30

11.    OTHER INFORMATION ...............................................................................31

1.     **INTRODUCTION**

Edgmont Golf Club, Inc. and Edgmont Country Club, the Debtors and Debtors-in-Possession (collectively, the "Debtors") filed voluntary petitions under Chapter 11 of Title 11 of the United States Code, 11 U.S.C. §§ 101-1532 (the "Bankruptcy Code") on October 28, 2013 (the "Petition Date") with the United States Bankruptcy Court for the Eastern District of Pennsylvania, Philadelphia vicinage (the "Bankruptcy Court").   Since the Petition Date, the Debtors have been operating as Debtors-in-Possession.

Concurrent with the filing of this Disclosure Statement ("Disclosure Statement"), the Debtors filed their Plan of Reorganization (in such capacity, the "Plan Proponent") dated February 27, 2015 (as such plan may be further amended from time to time, the "Plan").  A copy of the Plan accompanies this Disclosure Statement.  All capitalized terms not otherwise defined herein have the meanings ascribed to them in the Plan.

This Disclosure Statement summarizes what is in the Plan, and tells you certain information relating to the Plan and the process the Court follows in determining whether or not to confirm the Plan.  This Disclosure Statement also describes certain alternatives to the Plan, and the manner in which distributions will be made under the Plan.  In addition, this Disclosure Statement discusses the confirmation process and the voting procedures that holders of Claims and Interests must follow for their votes to be counted.

2.     **SUMMARY OF PLAN**

The Plan provides for the reorganization of the Debtors and their continued existence after the Effective Date as Reorganized Debtors.  The Plan provides for the payment of 100% of the Allowed Claims in each Class and Interests will remain unchanged and be retained.  The sale of the Real Property (excluding the Retained Property) to the Purchaser, an affiliate of The McKee Group, under the provisions of the Sale Agreement is the mechanism by which the Debtors are able to reorganize their affairs and to confirm their Plan under the provisions of the Bankruptcy Code.   Funding from the Purchaser under the Sale Agreement will enable the Debtors to make the Distributions required under the Plan.   The Sale Agreement between the EGC Debtor and Purchaser provides for the purchase and sale of the Real Property subject to certain conditions including approvals for the development of the Real Property (excluding the Retained Property).  The Debtor will not sell the Retained Property to the Purchaser but will retain it for future development.  The funds to make the Distributions required under the Plan shall be paid from the $6,000,000 deposit to be paid to the EGC Debtor by the Purchaser subject to the terms of the Sale Agreement one day after the Confirmation Order becomes a Final Order. The Deposit paid to EGC Debtor shall be credited against the purchase price and will be secured by a first mortgage lien on the Real Property subject to the terms and conditions of the Sale Agreement.  The ECC Debtor contemplates operating the country club until the closing under the Sale Agreement which will take a number of years after the Effective Date of the Plan.

**The EGC Debtor**

The Class 1A Secured Claims of Property Tax Liens will be paid in full on the Effective Date as provided by the provisions of Class 1A.  The amount of the Property Tax Liens due as of

the Petition Date was $265,432.75 ($2,594.43 to the Chester County Tax Claim Bureau and $262,838.32 to the Delaware County Tax Claim Bureau). The Class 1B Secured Claim of PNC Bank will be paid in full on the Effective Date as provided by the provisions of Class 1B. The balance due PNC Bank as of the Petition Date was approximately $2,467,271. The Class 1C Allowed Priority Non-Tax Claims will be paid in full on the Effective Date as provided by Class 1C. At present the Class 1C Claims are estimated to be zero. The Class 1D General Unsecured Claims will be paid one hundred (100%) percent of their Allowed Claims. The Allowed Class 1D Claims are estimated to be zero. The Class 1E Interests will remain unchanged as of the Petition Date.

### The ECC Debtor

The Class 2A Secured Claim of PNC Bank will be paid in full on the Effective Date as provided by the provisions of Class 1B. The unpaid aggregate liability of the ECC Debtor to PNC Bank equals the amount of the PNC Bank Allowed Class 1B Claim; provided however PNC Bank will only be entitled to a single recovery on account of these Claims. The Class 2B Allowed Priority Non-Tax Claims will be paid in full on the Effective Date as provided by Class 2B. At present the Class 2B Claims are estimated to be zero. The Class 2C General Unsecured Claims will be paid one hundred (100%) percent of their Allowed Claims. The Allowed Class 2C Claims are approximately $362,382. The Class 2D Interest Holders will remain unchanged as of the Petition Date.

Allowed Administrative Claims, Allowed Priority Tax Claims and the DIP Loan Claims are unclassified under the Plan and will be paid 100% in accordance with the provisions of Article IV of the Plan.

The Debtors believe that the treatment provided by the Plan provides a substantially greater return to holders of Allowed Claims than a liquidation.

**THE DEBTORS RECOMMEND A VOTE FOR ACCEPTANCE OF THE PLAN.**

3.    **DISCLAIMERS**

3.1    This Disclosure Statement may not be relied on for any purpose other than to determine how to vote on the Plan, and nothing contained in it shall constitute an admission of any fact or liability by any party, or be admissible in any proceeding involving the Plan or other legal effects of the reorganization on creditors, holders of claims or interests, or the Debtors.

3.2    The statements contained in this Disclosure Statement are made as of the date of the Order approving this Disclosure Statement unless another time is specified herein, and neither delivery of this Disclosure Statement nor any exchange of rights made in connection with this Disclosure Statement shall, under any circumstances, create an implication that there has been no change in the facts set forth herein since the date the Disclosure Statement was compiled.

3.3     The statement and representations contained herein are made solely by or at the insistence of the Debtors and no other party in interest is responsible for the accuracy or adequacy of the information contained herein.

3.4     No representations concerning the Plan are authorized by the Debtors other than as set forth in this Disclosure Statement.  The Debtors do not warrant or represent that the information contained herein is without any inaccuracy.

3.5     The presentation of the information set forth herein does not constitute factual or legal admissions by the Debtors.  Certain of the information, by its nature, is forward looking, contains estimates and assumptions which may prove to be false or inaccurate and contains projections which may be materially different from actual future experiences.  Such estimates and assumptions are made for informational purposes only and no representation or warranty is made with respect thereto.

3.6     Any estimates of claims or interests set forth in this Disclosure Statement may vary from the final amounts of claims or interests allowed by the Bankruptcy Court.

3.7     This Disclosure Statement will not be admissible in any other proceeding involving the Debtors, the Estates, or any other party, except in connection with its approval and the confirmation process for the Plan.

4.      **INFORMATION ABOUT THE REORGANIZATION PROCESS**

4.1     **Brief Explanation of Chapter 11**.  Chapter 11 is the principal business reorganization section of the Bankruptcy Code.  Pursuant to Chapter 11, normally a debtor is permitted to reorganize its business affairs for its own benefit and that of its creditors and other interest holders.  Unless a trustee is appointed, the debtor is authorized to continue to operate its business while all attempts to collect pre-petition claims from the debtor, or to foreclose upon property of the debtor, are stayed during the pendency of the case, unless otherwise ordered by the Bankruptcy Court.

          The objective of a Chapter 11 case is the formulation of a plan of reorganization or liquidation of the debtor and its affairs.  The Plan is a vehicle for resolving claims against the debtor, as well as providing for its future direction and operations.  Impaired creditors are given an opportunity to vote on any proposed plan, and the plan must be confirmed by the Bankruptcy Court to be valid and binding on all parties.  Once the plan is confirmed, all claims against the debtor which arose before the confirmation of the Plan are extinguished, unless specifically preserved in the Plan.  However, if the proposed Plan provides for the liquidation of the debtor's assets then, no discharge is granted to the debtor from any debt and liability that arose prior to the Petition Date.

4.2     **Purpose of Disclosure Statement**.  The purpose of a Disclosure Statement is to provide the creditors and equity holders with sufficient information about the Debtors and the proposed Plan of Reorganization so as to permit them to make an informed judgment when voting

3

on the Plan.  This Disclosure Statement therefore includes background information about the Debtor and also identifies the classes into which creditors have been placed by the Plan.  The Disclosure Statement describes the proposed treatment of each of those classes if the Plan is confirmed.  In addition, the Disclosure Statement contains information concerning the future prospects for the Debtor in the event of confirmation or, in the alternative, the prospects if confirmation is denied or the proposed Plan does not become effective.

This Disclosure Statement and the Exhibits described herein have been approved by Order of the Bankruptcy Court dated _____2015, as containing, in accordance with the provisions of the Bankruptcy Code, adequate information of a kind and in sufficient detail that would enable a reasonable, hypothetical investor, typical of a holder of impaired claims or interests that is entitled to vote on the Plan, to make an informed judgment with respect to the acceptance or rejection of the Plan.  The Bankruptcy Court's approval of this Disclosure Statement, however, does not constitute a recommendation by the Bankruptcy Court either for or against the Plan.

**YOU ARE URGED TO STUDY THE PLAN IN FULL AND TO CONSULT WITH YOUR COUNSEL AND OTHER ADVISORS ABOUT THE PLAN AND ITS IMPACT, INCLUDING POSSIBLE TAX CONSEQUENCES, UPON YOUR LEGAL RIGHTS. PLEASE READ THIS DISCLOSURE STATEMENT CAREFULLY BEFORE VOTING ON THE PLAN.**

4.3    **Notice to Holders of Claims and Interests**.  This Disclosure Statement is being transmitted to certain holders of Claims for the purpose of soliciting votes on the Plan and to others for information purposes.  The purpose of this Disclosure Statement is to provide adequate information to enable the holder of a Claim against the Debtors to make a reasonably informed decision with respect to the Plan prior to exercising the right to vote to accept or reject the Plan.

4.4    **Solicitation Package**. Accompanying this Disclosure Statement are, among other things, copies of the (a) the Plan, (b) the order approving the Disclosure Statement, which inter alia, provides notice of the time for submitting Ballots to accept or reject the Plan, the date, time and place of the hearing to consider the confirmation of the Plan and related matters, and the time for filing objections to the confirmation of the Plan, and (c) one or more ballots (and a return envelope), to be used by you, if you are entitled to vote, in voting to accept or reject the Plan.

4.5    **Eligibility to Vote.**  Pursuant to the provisions of the Bankruptcy Code, only classes of claims or interests that are "impaired" under a plan may vote to accept or reject such plan.  Generally, a claim or interest is impaired under a plan if the holder's legal, equitable or contractual rights are changed under such plan.  In addition, if the holders of claims or interests in an impaired class do not receive or retain any property under a plan on account of such claims or interests, such impaired class is deemed to have rejected the Plan under section 1126(g) of the Bankruptcy Code and therefore such holders do not need to vote on the Plan.

4.5.1    Unimpaired Classes Deemed to Accept the Plan.  The Claims in the Classes listed in the below stated tables are unimpaired and conclusively presumed to have accepted the Plan.

| Class | Description | Status |
|---|---|---|
| | **Claims Against Edgmont Golf Club, Inc.** | |
| Class 1C | Class 1C consists of Priority Non-Tax Claims against the EGC Debtor. | Unimpaired; not entitled to vote. |
| Class 1E | Class 1E consists of Interests in the EGC Debtor. | Unimpaired; not entitled to vote |
| | **Claims Against Edgmont Country Club** | |
| Class 2B | Class 2B consists of Priority Non-Tax Claims against the ECC Debtor. | Unimpaired; not entitled to vote. |
| Class 2D | Class 2D consists of Interests in the ECC Debtor. | Unimpaired; not entitled to vote. |

Pursuant to §1126(f) of the Bankruptcy Code, each of the above-referenced Classes of Claims are conclusively presumed to have accepted the Plan, and the votes of holders of Claims in such Classes therefore will not be solicited.

      4.5.2   Impaired Classes of Claims Entitled to Vote.  Under the Plan, holders of Claims in the Classes listed in the below stated tables are Impaired and are entitled to vote to accept or reject the Plan.

| Class | Description | Status |
|---|---|---|
| | **Claims Against Edgmont Golf Club, Inc.** | |
| Class 1A | Class 1A consists of the Secured Claims of Property Tax Liens against the EGC Debtor. | Impaired; entitled to vote |
| Class 1B | Class 1B consists of the Secured Claim of PNC Bank against the EGC Debtor. | Impaired; entitled to vote |
| Class 1D | Class 1D consists of General Unsecured Claims against the EGC Debtor. | Impaired; entitled to vote |

| Class | Description | Status |
|-------|-------------|--------|
| | **Claims Against Edgmont Country Club** | |
| Class 2A | Class 2A consists of the Secured Claim of PNC Bank against the ECC Debt   or. | Impaired; entitled to vote |
| Class 2C | Class 2C consists of General Unsecured Claims against the ECC Debtor. | Impaired; entitled to vote |

Each of the above referenced Classes of Claims shall be considered a separate Class for purposes of voting to accept or reject the Plan.

4.5.4   <u>Claims Subject to a Pending Objection are not Entitled to Vote</u>.  Creditors whose claims are subject to a pending objection are not eligible to vote unless such objections are resolved in their favor or, after notice and a hearing pursuant to Bankruptcy Rule 3018(a), the Bankruptcy Court allows the Claim temporarily or estimates the amount of the Claim for the purpose of voting to accept or reject the Plan.  Any creditor that wants its claim to be allowed temporarily or estimated for the purpose of voting must take the steps necessary to arrange for a hearing with the Bankruptcy Court under Bankruptcy Rule 3018(a) prior to the deadline established for voting for the Plan.

**THE BANKRUPTCY COURT HAS FIXED NO LATER THAN 4:00 P.M. (PREVAILING EASTERN TIME) ON _____, 2015 AS THE LAST DATE BY WHICH ALL BALLOTS MUST BE RECEIVED.**  All parties eligible to vote on the Plan are urged to complete and return their Ballots promptly to avoid delay in confirmation of the Plan.

4.6     **General Voting Procedures and Voting Deadline**.  After carefully reviewing the Plan, this Disclosure Statement, and (if you are entitled to vote) the detailed instructions accompanying your Ballot, please indicate your acceptance or rejection of the Plan by checking the appropriate box on the enclosed Ballot.  Please complete and sign your original Ballot and return in the envelope provided or by facsimile.   You must provide all of the information requested by the appropriate Ballot.  Failure to do so may result in the disqualification of your vote on such Ballot.

**IN ORDER FOR YOUR VOTE TO BE COUNTED, YOUR BALLOT MUST BE PROPERLY COMPLETED AS SET FORTH ABOVE AND IN ACCORDANCE WITH THE VOTING INSTRUCTIONS ON THE BALLOT AND ACTUALLY RECEIVED NO LATER THAN _____, 2015 AT 4:00 P.M. (PREVAILING EASTERN TIME) BY**

**ARIS J. KARALIS, ESQUIRE**
**MASCHMEYER KARALIS P.C.**
**1900 SPRUCE STREET**
**PHILADELPHIA, PA 19103**
**(215) 546-4500**

**BALLOTS RECEIVED AFTER SUCH TIME WILL NOT BE COUNTED UNLESS THE COURT SO ORDERS.    THE DEBTORS RECOMMEND A VOTE "FOR ACCEPTANCE" OF THE PLAN.**

4.7    **The Confirmation Hearing**.  The Bankruptcy Court has scheduled a hearing on the confirmation of the Plan to commence on **_____ at _:__ _.m.,** or as soon thereafter as the parties can be heard.  **The Confirmation Hearing will be held in the United States Bankruptcy Court, Robert N.C. Nix, Sr. Federal Courthouse, 900 Market Street, Second Floor, Courtroom No. 4, Philadelphia, PA 19107**.  At the hearing, the Bankruptcy Court will consider whether the Plan satisfies the various requirements of the Bankruptcy Code, including whether it is feasible and whether it is in the best interest of holders of claims and interests.  The Bankruptcy Court will also receive and consider a report of plan voting prepared by the Debtors concerning the votes for acceptance or rejection of the Plan cast by the parties entitled to vote.  The hearing may be adjourned from time to time by the Court without further notice except for the announcement of the adjournment date made at the hearing or at any subsequently adjourned hearing.  The Court has directed that objections, if any, to confirmation of the Plan be filed with the Clerk of the Court and served so that they are actually received on or before **____, 2015 at 5:00 p.m.** (prevailing Eastern time) by the Debtors' counsel and the Office of the United States Trustee.

4.8    **Acceptances Necessary to Confirm Plan**.    At the scheduled confirmation hearing, the Bankruptcy Court must determine, among other things, whether the Plan has been accepted by each impaired class.  Under Section 1126 of the Bankruptcy Code, an impaired class is deemed to have accepted the Plan if at least 2/3 in amount and more than ½ in number of the Allowed Claims of class members who have voted to accept or reject the Plan have voted for acceptance of the Plan.  Further, unless there is acceptance of the Plan by all members of an impaired class, the Bankruptcy Court must also determine that under the Plan class members will receive property of a value, as of the Effective Date of the Plan, that is not less than the amount that such class members would receive or retain if the Debtors were liquidated under Chapter 7 of the Bankruptcy Code on the Effective Date of the Plan.

4.9    **Confirmation of The Plan Without The Necessary Acceptances**.    If any Impaired Class fails to accept the Plan, the Plan Proponent intends to request that the Bankruptcy Court confirm the Plan as a "Cramdown" pursuant to § 1129(b) of the Bankruptcy Code with respect to such Class.  Section 1129(b) of the Bankruptcy Code provides that the Plan can be confirmed even if the plan is not accepted by all impaired classes, as long as at least one impaired class of claims has accepted it.  The Bankruptcy Court may confirm the Plan at the request of the Debtors if the Plan "does not discriminate unfairly" and is "fair and equitable" as to each impaired class that has not accepted the Plan.  The Plan does not discriminate unfairly within the meaning

7

of the Bankruptcy Code if a dissenting class is treated equally with respect to the other classes of equal rank.

A Plan is fair and equitable as to a class of secured claims that rejects a Plan if the Plan provides (a) (i) that holders of claims included in the rejecting class retain the liens securing those claims whether the property subject to those liens is retained by the Debtors or transferred to another entity, to the extent of the allowed amount of such claims; and (ii) that each holder of a claim of such class receives on account of that claim deferred cash payments totaling at least the allowed amount of that claim, of a value, as of the effective date of the plan, of at least the value of the holders' interest in the estate's interest in such property; (b) for the sale, subject to Section 363(k) of the Bankruptcy Code, of any property that is subject to the liens securing the claims included in the rejecting class, free and clear of liens, with the liens to attach to the proceeds of the sale, and the treatment of the liens on proceeds under clause (a) or (b) of this subparagraph; or (c) for the realization by such holders of the indubitable equivalent of such claims.

A plan is fair and equitable as to a class of unsecured claims that rejects a plan if the plan provides (a) for each holder of a claim included in the rejecting class to receive or retain on account of that claim property that has a value, as of the effective date of the plan, equal to the allowed amount of such claim or (b) that the holder of any claim or interest that is junior to the claims of such class will not receive or retain an account of such junior claim or interest any property at all.

A plan is fair and equitable as to a class of equity interests that rejects a plan if the plan provides (a) that each holder of an interest included in the rejecting class receive or retain on account of that interest property that has a value, as of the effective date of the plan, equal to the greatest of the allowed amount of any fixed liquidation preference to which such holder is entitled, and fixed redemption price to which such holder is entitled, or the value of such interest, or (b) that the holder of any interest that is junior to the interest of such class will not receive or retain under the plan on account of such junior interest any property at all.

5. **BEST INTEREST OF CREDITORS AND COMPARISON WITH CHAPTER 7 LIQUIDATION**

5.1    _Best Interest of Creditors_.  As a condition to confirmation of the Plan, Section 1129(a)(7)(A)(ii) of the Bankruptcy Code requires that each impaired class of claims or interests must receive or retain at least the amount or value it would receive if the Debtors would liquidate under a Chapter 7 scenario on the Effective Date of the Plan.  Attached as Exhibit 5.1 and made a part hereof, is Liquidation Analysis for each Debtor, which includes the assumptions and the results of each Debtor's analysis.  The liquidation analysis assumes a Chapter 7 liquidation in which a trustee would liquidate the assets of each Debtor's estate.  The liquidation analysis is based upon estimates and assumptions that, although developed and considered reasonable by the Debtors, are inherently subject to significant economic and competitive uncertainties and contingencies beyond the control of the Debtors.  Each liquidation analysis is also based upon assumptions with regard to liquidation decisions that are subject to change.  Accordingly, there can be no assurance that the values reflected in each liquidation analysis would be realized if the Debtors were, in fact, to undergo such a liquidation.  A Chapter 7 liquidation would result in a

substantial diminution in the value to be realized by holders of claims because of (i) the failure to realize the going concern value of the Debtors' businesses, (ii) additional administrative expenses involved in the appointment of a trustee, attorneys, accountants and other professionals to assist such trustee and (iii) additional expenses and claims, some of which would be entitled to priority and payment, which would arise by reason of the liquidation.  In addition, it should be noted that the analysis does not reduce the value of liquidation recoveries on account of a substantial time that likely would elapse before creditors would receive any distribution in respect to their claims in a liquidation scenario.  Consequently, the Debtors believe that the Plan which provides for the continuation of the country club operated by the ECC Debtor while the Purchaser obtains the approvals to purchase the Real Property provides a substantially greater return to Holders of Claims than would a liquidation.  Under the Plan, holders of Allowed General Unsecured Claims will receive one hundred (100%) percent of their Allowed Claims.  In the event of a liquidation under Chapter 7 of the Bankruptcy Code, in the best case scenario unsecured creditors may receive no more than the amount provided for under the Plan.  However, a liquidation under Chapter 7 will create many uncertainties and increased risks and therefore there is a great likelihood that the amount paid to holders of Allowed Unsecured Claims under a Chapter 7 liquidation will substantially less than under the Plan. Accordingly, the results achieved by the confirmation of a Plan are more beneficial than if these Chapter 11 Cases were converted to Chapter 7 cases.

5.2    Sources and Uses of Funds.  A sources and uses of funds as of the Effective Date is attached to this Disclosure Statement as Exhibit 5.2.  The Debtors assert that subject to the Purchaser paying the Deposit to the EGC Debtor one day after the Confirmation Order becomes a Final Order, the EGC Debtor will have sufficient funds on the Effective Date to make the payments required under the Plan.

6.    **GENERAL INFORMATION**

6.1    **Overview of the Real Property and Country Club.**  The Real Property was previously owned by the Sill family from 1719 to 1926. James Sill, son of John, inherited the 183 acre estate at the time of his father's death in 1774.  A stone dated 1791 is preserved in the dining room floor of the club house.  Many families resided in the estate after the Sill Family including the Eisenhower's. Mr. and Mrs. Donald Barrows owned the estate in the early 1960's and sold it to a group organized by Tanino "Tiny" Pedone.  Tiny was a golf pro who worked at Overbrook and Kimberton.  He envisioned a top notch affordable private golf club for the average golfer.  The Barrows estate was a perfect start for a course.  Like many of the famous golf courses around the world the course was named after the local area "Edgmont, without the middle "e".  Frank and Nazz Mariani of Nazz Mariani Company became partners in the project and constructed the course which started April of 1963.  Nazz Mariani provided the needed excavation experience to carve the 18-hole golf course out of the rolling hills and wooded countryside along the picturesque Ridley Creek Valley.  The site was perfect for a golf course, with the former mansion becoming the 7700 square foot club house and the stables becoming the pro shop and men's locker room.  The course opened for limited play on August 21, 1964 and opened to full play in April 1965.

At approximately the same time, the Commonwealth of Pennsylvania purchased the land adjacent to the club which was to become the 2600 acre Ridley Creek State Park. The Park provided a breathtaking back drop, free of housing developments, for the golfer and social visitor alike. In 1997, a banquet facility seating 200 persons was added and the club hosts many golf outings, charity auctions, wedding receptions, business meetings and other special events. The course was substantially renovated starting in 2004. The irrigation system was replaced with a wireless computer controlled system. The cart paths were replaced, widened and lengthened and all of the sand traps were updated.

The Edgmont Country Club has always been very active in using golf to help charities. In 1967 Bob Hope visited for a benefit for blind golfers. Since 1978 it has been the home for the Edgmont Classic which benefits the Arthritis Foundation and starting in 2005 has been benefiting local branches of the Special Olympics. In 2007 the United States Blind Golf Association (USBGA) held its 62 National Championship at Edgmont. This was the 40th anniversary of the Bob Hope for the blind tournament. In 2010 the United States Blind Golf Association (USBGA) returned to hold its 65 National Championship at Edgmont. The country club is operated as a private club.

The club is located at 5180 West Chester Pike, Edgemont, Delaware County, Pennsylvania, 19028, with a small portion of the property extending into Willistown Township, Chester County. The total acreage is approximately 190 acres. There are no capital assessments or house minimums and three levels of non-equity memberships are available as follows: (a) social members can use the driving range, dining and bar facilities but have no golf privileges. The social member also has a house charge and is billed monthly. The room rental fee for parties and meetings is waived; (b) green card members have all of the privileges of social members plus full golf privileges; (c) green card members pay green fees for each round of golf; and (d) gold card members have all of the privileges of green card members but do not pay green fees each time they play. Since its inception, the golf course has been owned and operated by the Mariani family.

6.2   **The Debtors' Corporate Structure.**   The EGC Debtor is a Pennsylvania corporation which owns the Real Property, furniture, fixtures and equipment. Pam Mariani and the Trust each own fifty (50%) percent of all the shares of the EGC Debtor. The ECC Debtor is a Pennsylvania Corporation which owns the club liquor license, the inventory and the accounts receivable generated from operations. The board of directors of each Debtor is comprised of two directors, Pam Mariani and John Mariani.

6.3   **Debtors' Assets as of the Petition Date**. As of Petition Date, the EGC Debtor's assets consisted of cash scheduled at $3,065; a utility security deposit scheduled at $7,738; furniture, fixtures and equipment scheduled at $138,000 and Real Property scheduled with an unknown value. As of the Petition Date, the ECC Debtor's assets consisted of cash scheduled at $9,742; a 500 index fund scheduled at $6,338; accounts receivable scheduled at $60,164 (net of bad debts); a catering club liquor license scheduled with an unknown value, and inventory scheduled at $20,712.

6.4   **The Debtors' Prepetition Debt.**   As of the Petition Date, the Debtors'

consolidated senior debt obligations to PNC Bank were approximately $2.3 million.  As of the Petition Date, the EGC Debtor had scheduled Property Tax Liens at $254,060, Priority Tax Claims at zero, Priority-Non Tax Claims at zero, and unsecured claims at zero.  As of the Petition Date, the ECC Debtor had scheduled $2,208 of Priority Tax Claims, Priority-Non Tax Claims at zero and unsecured claims at $362,382.

6.5    **Events Leading to the Chapter 11 Filings**.    Since the 2009 economic downturn, the Debtors began experiencing a decrease each year, in membership and reduced play of the golf course, which resulted in lower revenues and a working capital shortage. As a result, the Debtors encountered significant challenges in servicing their secured debt and timely paying their vendors.  On or about January 18, 2013, PNC Bank, N.A., confessed judgment against the Debtors in the Court of Common Pleas, Delaware County in the amount of $2,732,334.69.   By order dated October 23, 2013, the Debtors petition to have the confessed judgment stricken or opened was denied by the Court of Common Pleas.  The Debtors were also facing a number of collection matters that had been initiated prior to the Petition Date.  As a result, the Debtors were placed in the untenable position of potentially having their assets subject to execution to satisfy the claims of PNC Bank, N.A. and/or unsecured creditors.  The Debtors decided to file for Chapter 11 protection to preserve their going concern value and to reorganize their affairs for the benefit of all Creditors and Interests.

6.6    **Bankruptcy Proceedings**

6.6.1    Voluntary Petitions; Joint Administration.    On October 28, 2013 (the "Petition Date"), each of the Debtors filed a voluntary petition with the United States Bankruptcy Court for the Eastern District of Pennsylvania under chapter 11 of title 11 of the Bankruptcy Code.  The Debtors are operating their businesses and managing their property as debtors in possession pursuant to sections 1107(a) and 1108 of the Bankruptcy Code.  These Chapter 11 Cases are being jointly administered.

6.6.2    Retention of Professionals.    On the Petition Date, the Debtors filed an application to retain Maschmeyer Karalis P.C. ("MK") as their bankruptcy counsel.  The Court approved the application to employ MK by Order dated November 20, 2013 (Doc. No. 49). Thereafter, the Debtors also filed an application to employ SSG Advisors, LLC ("SSG") as Investment Bankers, which application was approved by Order dated January 8, 2014 (Doc. No.80).

6.6.3    Cash Collateral Motion.    Concurrent with the filing of their voluntary petitions, the Debtors filed a motion for authority to use cash collateral and provide adequate protection.  By numerous orders, the Debtors were authorized to use cash collateral. (Doc. Nos. 24, 95, 132, and 167)

6.6.4    Motion to Authorize Payment of Certain Prepetition Wages, Benefits and Reimbursable Expenses.  The Debtor also filed a Motion seeking Entry of an Order authorizing the payment of certain prepetition wages, benefits and reimbursable expenses which Motion was granted by Order dated October 30, 2013.  (Doc. No. 22)

6.6.5    Motion for Entry of Orders Providing Adequate Assurance to Utility Companies.   The Debtors also filed a motion seeking entry of orders prohibiting utility companies from discontinuing, altering, or refusing service, deeming the utility companies to have adequate assurance of payment and related relief which motion was granted. (Doc. Nos. 28 and 56).

6.6.6    Schedules and Statements of Financial Affairs.   On or about November 25, 2013, the Debtors filed with the Bankruptcy their Bankruptcy Schedules and Statement of Financial Affairs. (Doc. Nos. 51 and 52).

6.6.7    Claims Bar Date.   By Order dated January 6, 2014, the Bankruptcy Court established February 14, 2014 as the General Bar Date and the last date for filing proofs of claim relating to Claims or Interests which either arose or may be deemed to have arisen prior to the Petition Date (other than those of Governmental Units).   For Claims of Governmental Units which either arose or may be deemed to have arisen prior to the Petition Date, the Governmental Unit Bar Date was April 26, 2014. (Doc. No. 77)

6.6.8    Extensions of Exclusivity. The Debtors filed numerous motions to extend their exclusive period to file their plan and to solicit acceptances and rejections of their plan.  By Order dated February 19, 2014, the Bankruptcy Court extended to June 25, 2014, the exclusive period during which the Debtors have the exclusive right to file their plan (the "Exclusive Filing Period") in these Chapter 11 Cases and extended to August 24, 2014 the exclusive right to solicit acceptances of their plan (the "Exclusive Solicitation Period") (Doc. No. 112).  By Order dated June 18, 2014, the Debtors Exclusive Filing Period was extended to October 23, 2014 and the Debtors Exclusive Solicitation Period was extended to December 21, 2014 (Doc. No. 141).  By Order dated October 15, 2014, the Debtors Exclusive Filing Period was extended to February 28, 2015 and the Debtors Exclusive Solicitation Period was extended to April 29, 2015 (Doc. No. 158).  The Debtors intend to seek a further extension of the Exclusive Solicitation Period to June 30, 2015.

6.6.9    Marketing of the Debtors Assets.   SSG was engaged by the Debtors in December 2013, and immediately initiated an extensive and aggressive marketing of the Debtors' assets for sale.  Beginning in January 2014, SSG contacted over one hundred ninety four (194) potential buyers including golf course operators, financial investors and real estate developers, of which eleven (11) parties submitted offers to purchase the Real Property.  The Debtors, SSG and the Debtors' professionals negotiated with each of these parties, and ultimately the Debtors executed an LOI in July 2014 with The McKee Group which contained an exclusivity provision.  The EGC Debtor ultimately executed the Sale Agreement with the Purchaser, an affiliate of The McKee Group.

6.10    Debtors' Plan.   On February 27, 2014, the Debtors filed their Joint Plan of Reorganization and Joint Disclosure Statement in these Chapter 11 Cases.

6.7    **Post-Confirmation Officers and Directors; Compensation**.    The Debtors shall compensate Pam Mariani, the General Manager and a director of the Debtors, after the Effective Date in the same amount as during the course of these Chapter 11 Cases as follows:

(a) wages in the gross weekly amount of $650.00[1] and (b) provide her with the normal and customary benefits provided to all management employees, which includes health insurance coverage. The Debtors shall also compensate Peter Mariani, the Chief Financial Officer of the Debtors in the same amount as during the course of these Chapter 11 Cases as follows: (a) provide Peter Mariani with the normal and customary benefits provided to all management employees, which includes health insurance coverage. John Mariani who serves as a director of the Debtors with Pam Mariani will not be compensated. The Debtors reserve the right to modify the compensation of these individuals as they deem appropriate in their sole business judgment. The operations of the Debtors have been conducted and will continue to be conducted by Pam Mariani and Peter Mariani who have the direct responsibility for the planning, organization, direction and control of all levels of management and all phases of the business operations. The Debtors reserve the right to change their officers and/or directors as they deem appropriate.

7. **THE PLAN**

The following is a summary of the significant provisions of the Plan and is qualified in its entirety by the provisions of the Plan, a copy of which accompanies this Disclosure Statement. In the event and to the extent that the description of the Plan contained in this Disclosure Statement is inconsistent with any provision of the Plan, the provisions of the Plan shall control and take precedence. All creditors are urged to carefully read the Plan.

The treatment in the Plan is in full and complete satisfaction of the legal, contractual, and equitable rights that each Entity holding an Allowed Claim or an Allowed Interest may have in or against each of the applicable Debtors or their property. All Distributions under the Plan will be tendered to the Person holding the Allowed Claim or Allowed Interest in accordance with the terms of the Plan. Except as specifically set forth in the Plan, no Distributions will be made and no rights will be retained on account of any Claim or Interest that is not an Allowed Claim or Allowed Interest. At the sole discretion of the EGC Debtor, Intercompany Claims may be extinguished at any time after the Effective Date of the Plan.

Allowed Claims against the EGC Debtor and ECC Debtor will be satisfied solely from the respective Assets of the EGC Debtor and the Assets of ECC Debtor and their respective Estates; provided, however, the EGC Debtor may utilize the proceeds from the Deposit paid to it by the Purchaser as it elects to make the Distributions required under the Plan. Nothing in the Plan or the Disclosure Statement shall constitute or be deemed to constitute an admission that any one of the Debtors is subject to or liable for any claim against the other Debtor. A Claim against multiple Debtors, to the extent allowed in each Debtor's case, will be treated as a separate claim against each Debtor's Estate for all purposes (including, but not limited to, voting and Distribution, provided, however, that there shall be only a single recovery on account of such Claims and any Distribution from a Debtor on account of such Claims shall take into account the Distributions to be made by the other Debtor on account of such Claims pursuant to the Plan), and such Claim will be administered and treated in the manner provided in the Plan. No holder of a Claim against multiple Debtors shall receive more than 100% on account of such Claim.

---

[1] The wages earned by Pam Mariani during the pendency of these Chapter 11 Cases have been accrued and will be paid to her on the Effective Date.

7.1    **Classes of Claims and Interests**

The Plan classifies the various claims against each Debtor as follows:

7.1.1    The EGC Debtor.  Four (4) separate classes of creditors (Class 1A, Class 1B, Class 1C and Class 1D) and one (1) class of interest holders (Class 1E).

7.1.2    The ECC Debtor.  Three (3) separate classes of creditors (Class 2A, Class 2B and Class 2C) and one (1) class of interest holders (Class 2D).

7.1.3  In addition, Administrative Claims, Priority Tax Claims and the DIP Loan Claims are not classified for purposes of voting or receiving distributions under the Plan, as is permitted by Section 1123(a)(1) of the Bankruptcy Code.  Rather, all such claims are treated separately as unclassified claims.

7.2    **Unclassified Claims.**  Administrative Claims, Priority Tax Claims and the DIP Loan Claims are unclassified Claims that will be treated as follows:

7.2.1    Time for Filing Administrative Claims.  The holder of an Administrative Claim other than (i) a Fee Claim or (ii) a liability incurred and paid in the ordinary course of business by the Debtors, must file with the Bankruptcy Court and serve on the Debtors and its counsel, a motion or request for the payment of such Administrative Claim within thirty (30) days after the Effective Date.  Such motion or request must include, at minimum, (i) the name of the holder of the claim, (ii) the amount of the claim, and (iii) the basis of the claim.  Furthermore, all persons and entities asserting Administrative Claims, which do not fall within Section 4.1 of the Plan, shall file a motion or request for the payment of such administrative claim within thirty (30) days of the Effective Date, or be forever barred from asserting any such Administrative Claim.  Failure to file a motion or request for payment timely and properly shall result in the Administrative Claim being forever barred and discharged.

7.2.2    Time for Filing Fee Claims.  Each professional person who holds or asserts an Administrative Claim that is a Fee Claim incurred before the Effective Date shall be required to file with the Bankruptcy Court a final fee application within thirty (30) days after the Effective Date.  Failure to file a final fee application timely shall result in the Fee Claim being forever barred and discharged.

7.2.3    Allowance of Administrative Claims.  An Administrative Claim with respect to which notice is required and which has been properly filed pursuant to Section 4.1.1 of the Plan shall become an Allowed Administrative Claim if no objection is filed within thirty (30) days of the filing and service of notice of such Administrative Claim.  If an objection is filed within such thirty (30) day period, the Administrative Claim shall become an Allowed Administrative Claim only to the extent allowed by Final Order.  An Administrative Claim that is a Fee Claim, and with respect to its fee application has been timely filed pursuant to Section 4.1.2 of the Plan, shall become an Allowed Administrative Claim only to the extent allowed by Final Order.

      7.2.4   <u>Payment of Allowed Administrative Claim</u>.  Each holder of an Allowed Administrative Claim shall receive (i) the amount of such holder's Allowed Claim upon the Effective Date, (ii) such other treatment as may be agreed upon in writing by the Debtors and such holder, or (iii) as may be otherwise ordered by the Court, provided that an Administrative Claim representing a liability incurred in the ordinary course of business by the Debtors may be paid in the ordinary course of business.  As of January 31, 2015, the unpaid professional fees total approximately $665,000 (Debtors' Counsel $425,000 and subject to receipt of the Deposit, the Debtors' Investment Banker interim fees will be $240,000).

      7.2.5   <u>Professional Fees Incurred After the Effective Date</u>.  Professional fees incurred by the Debtor after the Effective Date must be approved by the Debtor and, thereafter, can be paid without further Order of the Court.  Any dispute which may arise with regard to professional fees after the Effective Date shall be submitted to the Bankruptcy Court, which shall retain jurisdiction to settle these types of disputes.  In the event of such dispute, the Debtor shall pay that portion of the fees, if any, which is not in dispute, punctually.

      7.2.6   <u>General Provisions</u>.  No post-petition interest or other similar post-petition charges will be paid on account of Administrative Claims.

      7.2.7   <u>Treatment of Priority Tax Claims</u>.  Each holder of an Allowed Priority Tax Claim shall receive, at the sole option of the Debtor (i) the amount of such holder's Allowed Claim on the Effective Date; (ii) the amount of such holder's Allowed Claim, plus interest accrued at the applicable statutory rate, in equal monthly cash payments in accordance with the provisions of § 1129(a)(9)(c) of the Bankruptcy Code or (iii) such other treatment as may be agreed upon in writing by the Debtor and such Creditor.  The Priority Tax Claims total $2,208.

      7.2.7   <u>No Liability for Certain Tax Claims</u>.  To the extent that any Claim asserted by a Governmental Unit seeks recovery of a fine on or penalty against the Debtors, that portion of such Claim, if allowed, which represents such fine or penalty, shall be treated as a General Unsecured Claim.

      7.2.8   **Treatment of DIP Loan**.  Pam Mariani and the Trust, the two holders of Claims in connection with the DIP Loan, shall retain their Liens and Claims against the Debtors in the same priority, extent and validity as granted by the Final Order approving the DIP Loan until the DIP Loan is paid in full.  The maturity date of the DIP Loan is the earlier of (i) the Effective Date of any plan confirmed by the Debtors, (ii) closing on the sale of substantially all of the Debtors' assets, or (iii) March 31, 2015.  The reference to March 31, 2015 as the maturity date has been waived by the holders of Claims that comprise the DIP Loan.

    7.3   **Estimation of Classes of Claims**.  The Classes of Creditors and estimated principal amounts of the claims in each Class are as follows:

15

| Class | Description | Estimated Amount |
|-------|-------------|------------------|
| | **Claims Against Edgmont Golf Club, Inc.** | |
| Class 1A | Class 1A consists of Secured Claims of Property Tax Liens against the EGC Debtor | $   265,433 |
| Class 1B | Class 1B consists of Secured Claims of PNC Bank against the EGC | $ 2,467,271 |
| Class 1C | Class 1C consists of Priority Non-Tax Claims against the EGC Debtor. | $         00 |
| Class 1D | Class 1D consists of General Unsecured Claims against the EGC Debtor | $         00 |
| | **Claims Against Edgmont Country Club** | |
| Class 2A | Class 2A consists of the Secured Claim of PNC Bank against the ECC Debt  or. | $ 2,467,271 |
| Class 2B | Class 2B consists of Priority Non-Tax Claims against the ECC Debtor. | $         00 |
| Class 2C | Class 2C consists of General Unsecured Claims against the ECC Debtor. | $   362,382 |

7.4     **Treatment of Claims and Interests.**  Only the holders of Allowed Claims - that is holders of claims which are not in dispute, are not contingent, are not unliquidated in amount and are not subject to objection or estimation - are entitled to receive distributions under the Plan.  Until a Claim becomes an Allowed Claim, distributions will not be made to the holder of such Claim.  The Plan provides for the division of holders of Claims into the following Classes:

**Edgmont Golf Club, Inc.**

**Class 1A.   Secured Claims of Property Tax Liens.**  Class 1A is impaired.  The treatment and consideration to be received by holders of Allowed Class 1A Secured Claims of Property Tax Liens shall be in full settlement, satisfaction, release and discharge of its respective secured claims and liens.

1A.1   Amount of Allowed Property Tax Liens.  The Allowed Property Tax Liens shall equal (a) the amount of unpaid property taxes for the Real Property due to Chester County, Willistown Township and the Great Valley School District as of the Petition Date and (b) the amount of unpaid property taxes for the Real Property due to Delaware County, Edgemont

16

Township and the Rose Tree Media School District as of the Petition Date.

      1A.2   <u>Claims Filed by the holders of Property Tax Liens</u>.  The Chester County Tax Claim Bureau filed a proof of claim against the EGC Debtor (claim number 9-1) in the amount of $2,594.43 in connection with the portion of the Real Property located in Chester County.  The Delaware County Tax Claim Bureau filed two proofs of claim against the EGC Debtor (claim number 18-1) in the amount of $218,474.82 and claim number 19-1 in the amount of $44,363.50 in connection with the portion of the Real Property located in Delaware County.

      1A.3   <u>Payment of Allowed Secured Property Tax Liens</u>. The Allowed Class 1A Secured Property Tax Liens plus accrued interest at the applicable statutory rate shall be paid on the Effective Date.

      1A.4   <u>Retention of Liens</u>.  Each holder of an Allowed Class 1A Secured Property Tax Lien shall retain its statutory Lien in the same priority, extent and validity as existed on the Petition Date against the Real Property until its respective Allowed Class 1A Secured Property Tax Lien is paid.

      1A.5   <u>Deficiency Claim</u>.  The Secured Property Tax Liens are treated as fully secured claims and therefore they hold no Deficiency Claim.

      1A.6   <u>Extinguishment of Lien</u>.  Upon payment of the Allowed Secured Property Tax Liens as provided herein, the respective Lien of each holder shall be extinguished and shall effect a full and final satisfaction of such claim such that neither the Debtors, nor the Reorganized Debtors shall have any liability on account of such Claim.

    **Class 1B.  <u>Secured Claim of PNC Bank</u>**.  Class 1B is impaired.  The treatment and consideration to be received by PNC Bank on account of its Allowed Secured Claim shall be in full settlement, satisfaction, release and discharge of all of its respective claims and liens.

      1B.1.   <u>Allowed Secured Claim of PNC Bank</u>.  By virtue of a series of transactions executed between the Debtors as co-borrowers and PNC Bank between 1997 and 2005, each of the Debtors are obligated to PNC Bank for amounts due pursuant to: (a) a note in the original principal amount of $2.2 million (the "2.2 Million Note"); (b) a line of credit with a principal balance of $500,000 (the "Line of Credit"); (c) a note in the original principal amount of $100,000 (the "$100,000 Note"); (d) an ISDA Master Agreement (the "Swap Agreement"); (e) costs and reasonable legal expenses incurred as of the Petition Date (the "PNC Pre-Petition Fees") and (f) the Complaint in Confession of Judgment filed by PNC Bank in the amount of $2,732,334.69, on or about January 18, 2013 against Edgmont Golf Club, Inc. and Edgmont Country Club ("Defendants") in an action styled <u>*PNC Bank v. Edgmont Golf Club, Inc. and Edgmont Country Club*</u>, Delaware County Common Pleas Court Docket No. 2013-522 (the "Judgment by Confession" collectively with the $2.2 Million Note, the Line of Credit, the $100,00 Note,  the Swap Agreement, and the PNC Pre-Petition Fees, the "Existing Obligations")).  On March 13, 2013, the Debtors filed a Petition to Open/Strike the Judgment by Confession and after hearing, on October 23, 2013, the Honorable G. Michael Green issued an Order denying the Petition to Open/Strike the Judgment by Confession (the "State Court Order").  On December 19, 2013, Defendants filed a Notice of Appeal in the Delaware County Court of

Common Pleas, appealing the State Court Order to the Superior Court of Pennsylvania, the appeal is styled *PNC v. Edgmont Golf Club, Inc. and Edgmont Country Club,* Superior Court Docket No. 114 EDA 2014 (the "Appeal").  On February 10, 2014, PNC Bank filed a motion to quash the appeal with the Superior Court on the basis that Debtors had not requested relief from the automatic stay in the bankruptcy proceeding before filing their notice of appeal.  The Debtors filed a motion to modify the automatic stay *nunc pro tunc,* effective as of December 18, 2013 (the "Relief from Stay Motion"), in order to cure the defect raised by PNC Bank and to allow the appeal of the State Court Order to proceed to a final adjudication.  By Order of the Bankruptcy Court dated February 21, 2014, the Appeal is stayed pending further Order of the Bankruptcy Court.

   1B.2  <u>Amount of the Allowed Secured Claim of PNC Bank</u>.  The Debtor asserts that the amount due PNC Bank as of the Petition Date on account of the Existing Obligations and the Confessed Judgment is as follows:

| | |
|---|---:|
| $2.2 Million Note | $1,726,163.78 |
| Interest as of Petition Date | 368.25 |
| Line of Credit | 500,000.00 |
| Interest as of Petition Date | 1,611.10 |
| $100,000 Note | 52,951.50 |
| Interest as of Petition Date | 25.13 |
| Swap Agreement | 151,689.02 |
| PNC Pre-Petition Fees | 34,462.45 |
| Total | $2,467,271.23 |

The above stated amount is subject to increase by (i) the amount of interest (at the contract rate) that accrued after the Petition Date less the amount of adequate protection payments paid by the Debtors to PNC Bank and (ii) reasonable fees and costs incurred after the Petition Date to the extent allowed under 11 U.S.C. §506(b).  To the extent that the Court determines that the PNC Bank Allowed Claim is different than the amount fixed herein, the amount fixed by the Court shall control under the Plan, unless otherwise agreed by PNC Bank and the Debtors.

   1B.2  <u>Claims filed by PNC Bank</u>.  PNC Bank filed an identical secured proof of claim in the amount of $2,669,808.76 against each Debtor in these Chapter 11 Cases (docketed as claim no. 10-1 in the EGC Debtor case and claim no. 8 in the ECC Debtor case) which amount is higher than the amount the Debtor believes it owes PNC Bank.  Accordingly, the Debtors intend to object to these claims.  PNC Bank shall only be entitled to a single recovery on account of these secured claims.

   1B.3.  <u>Post-Petition Payments to PNC Bank</u>.  Pursuant to the interim cash collateral orders, the Debtors paid adequate protection payments to PNC Bank on account of the PNC Bank Allowed Secured Claim.

   1B.4.  <u>Payment of Allowed Secured Claim</u>. The balance of the Allowed Class 1B Secured Claim of PNC Bank less the adequate protection payments paid to PNC Bank plus accrued interest (at the contract rate) shall be paid on the Effective Date to PNC Bank.

1B.5    <u>Retention of Liens</u>.  PNC Bank shall retain its liens in the same priority, extent and validity as existed on the Petition Date in the Assets of EGC Debtor and the Assets of ECC Debtor until the PNC Bank Allowed Secured Claim is paid.

1B.6    <u>Deficiency Claim</u>.  The PNC Bank Allowed Secured Claim is treated as a fully secured claim and therefore PNC Bank holds no Deficiency Claim.

1B.7    <u>Extinguishment of Lien</u>.   Upon payment of the PNC Bank Allowed Secured Claim as provided herein, the Liens of PNC Bank shall be extinguished and shall effect a full and final satisfaction of such claim such that neither the Debtors, nor the Reorganized Debtors, shall have any liability on account of such Class 1B Claim.

**Class 1C.  <u>Priority Non-Tax Claims</u>**.  Class 1C is not impaired.  Each holder of a Priority Non-Tax Claim, except as otherwise agreed by the holder of such claim, shall be paid in accordance with the priorities set forth in the Bankruptcy Code within thirty (30) days after the Effective Date.  The Distributions to holders of Claims in Class 1C shall take into account Distributions to be made by each Debtor on account of Allowed Priority Non-Tax Claims so that there shall be only a single recovery on account of these Claims

**Class 1D.  <u>General Unsecured Claims</u>.**  Class 1D is impaired.  The treatment and consideration to be received by the holders of Allowed Unsecured Claims shall be in full settlement, satisfaction, release and discharge of all their respective claims and liens.  Class 1D consists of all Allowed Claims not otherwise classified herein.

1D.1    **<u>Treatment of Allowed Unsecured Claims</u>**.  Holders of Allowed Class 1D Claims shall be paid one hundred (100%) percent of their Allowed Claims on the later date of thirty (30) days after the (i) Effective Date or (ii) the date on which the Claim becomes an Allowed Claim.

1D.2    **<u>General Provisions</u>.**   No interest or other similar post-petition charges will be paid on account of Class 1D Claims and no General Unsecured Claim shall be allowed to the extent that it is for post-petition interest or other similar post-petition charges. Notwithstanding the foregoing, any Unsecured Claim as to which insurance coverage exists and is paid shall not receive a distribution hereunder but, rather, shall be paid exclusively as provided under the applicable policy or policies of insurance and only to the extent of said insurance coverage.   The Distributions to holders of Claims in Class 1D shall take into account Distributions to be made by each Debtor on account of such Claims so that there shall be only a single recovery on account of these Claims.

**Class 1E.  <u>Interest Holders</u>.**  Class 1E is not impaired.  As of the Petition Date, Pam Mariani and the Trust each owned fifty (50%) percent of all the Interests in the EGC Debtor.  As of the Effective Date, the Class 1E interests in the EGC Debtor shall remain equal to the Interests as of the Petition Date.

### <u>Edgmont Country Club</u>

**Class 2A.  <u>Secured Claim of PNC Bank</u>.**  Class 2A is impaired.  The treatment and

consideration to be received by PNC Bank on account of its Allowed Class 2A Secured Claim shall be in full settlement, satisfaction, release and discharge of its respective secured claims and liens.

      2A.1   <u>Amount of PNC Bank Allowed Claim and Payment</u>.  The amount of the PNC Bank Class 2A Claim against the ECC Debtor shall equal the amount of the Allowed PNC Bank Class 1B Claim against the EGC Debtor; provided, however PNC Bank shall only be entitled to a single recovery on account of these two Claims.  Therefore, upon payment of the PNC Bank Class 1B Claim by the EGC Debtor, the PNC Bank Class 2A Claim against the ECC Debtor shall be deemed paid in full and vice versa, if the PNC Bank Class 2A Claim should be paid by the ECC Debtor first.

      2A.2   <u>Retention of Liens</u>.  PNC Bank shall retain its liens in the same priority, extent and validity as existed on the Petition Date in the Assets of EGC Debtor and the Assets of ECC Debtor until the PNC Bank Allowed Secured Claim is paid.

      2A.3   <u>Deficiency Claim</u>.  The PNC Bank Claim is treated as a fully secured claim and therefore there is no Deficiency Claim.

      2A.4   <u>Extinguishment of Lien</u>.  Upon payment of the PNC Bank Allowed Secured Claim as provided herein, the Lien of PNC Bank shall be extinguished and shall effect a full and final satisfaction of such claim such that neither the Debtors, nor the Reorganized Debtors shall have any liability on account of such Claim.

    **Class 2B.**  **Priority Non-Tax Claims**.  Class 2B is not impaired.  Each holder of a Priority Non-Tax Claim, except as otherwise agreed by the holder of such claim, shall be paid in accordance with the priorities set forth in the Bankruptcy Code within thirty (30) days after  the Effective Date.  The Distributions to holders of Claims in Class 2B shall take into account Distributions to be made by each Debtor on account of Allowed Priority Non-Tax Claims so that there shall be only a single recovery on account of these Claims.

    **Class 2C.**  **General Unsecured Claims.**  Class 2C is impaired.  The treatment and consideration to be received by the holders of Allowed Unsecured Claims shall be in full settlement, satisfaction, release and discharge of all their respective claims and liens. Class 2C consists of all Allowed Claims not otherwise classified herein.

      2C.1.  **Treatment of Allowed Unsecured Claims**.  Holders of Allowed Class 1D Claims shall be paid one hundred (100%) percent of their Allowed Claims on the later date of thirty (30) days after the (i) Effective Date or (ii) the date on which the Claim becomes an Allowed Claim.

      2C.2  **General Provisions.**  No interest or other similar post-petition charges will be paid on account of Class 2C Claims and no General Unsecured Claim shall be allowed to the extent that it is for post-petition interest or other similar post-petition charges. Notwithstanding the foregoing, any Unsecured Claim as to which insurance coverage exists and is paid shall not receive a distribution hereunder but, rather, shall be paid exclusively as provided under the applicable policy or policies of insurance and only to the extent of said insurance

coverage.   The Distributions to holders of Claims in Class 2C shall take into account Distributions to be made by each Debtor on account of Allowed Unsecured Claims so that there shall be only a single recovery on account of these Claims.

**Class 2D.  Interest Holders.**  Class 2D is impaired.  The Class 2D interests in the ECC Debtor shall remain equal to the Interests as of the Petition Date.

## 8.    PROVISIONS FOR EXECUTION OF THE PLAN

8.1    **Revesting of Assets**.  On the Effective Date, the EGC Debtor shall be vested with all of its respective interests and the Assets of EGC Debtor comprising its Estate free and clear of all Claims, Liens, charges and other interests of Creditors other than as expressly set forth in the Plan and the ECC Debtor shall be vested with all of its respective interests and the Assets of ECC Debtor comprising its Estate free and clear of all Claims, Liens, charges and other interests of Creditors other than as expressly set forth in the Plan.  All claims or Causes of Action held by the Debtors may be prosecuted or enforced by the Debtors pursuant to 11 U.S.C. § 1123(b)(3).

8.2    **Post-Confirmation Operations of Country Club**.  As of the Effective Date, (a) the ECC Debtor may continue to operate its business including, the golf course and country club and use, acquire, and dispose of property and (b) the EGC may operate its business and use, acquire, and dispose of property free of any restrictions of the Bankruptcy Code or Bankruptcy Rules, other than those restrictions expressly imposed by the Plan and Confirmation Order.  The ECC Debtor contemplates operating the country club until the closing under the Sale Agreement which may take a number of years after the Effective Date.

8.3    **Sale of Real Property**.  The Sale Agreement between the EGC Debtor and Purchaser provides for the purchase and sale of the Real Property subject to certain conditions including approvals for the development of the Real Property (excluding the Retained Property). The Debtor will not sell the Retained Property to the Purchaser but will retain it for future development; provided, however, if the subdivision of the Retained Property from the Real Property has not been completed by the date of closing under the Sale Agreement, the Retained Property will be conveyed to Purchaser as part of the Real Property (subject to the terms and restrictions of the Sale Agreement) and the Retained Property will be conveyed back to the EGC Debtor after the subdivision of the Retained Property has been completed.  The sale of the Real Property (excluding the Retained Property) to the Purchaser under the provisions of the Sale Agreement is the mechanism by which the Debtors are able to reorganize their affairs and to confirm the Plan under the provisions of the Bankruptcy Code.  Funding from the Purchaser under the Sale Agreement will enable the Debtors to make the Distributions required under the Plan.  The Purchase Price for the Real Property being sold (excluding the Retained Property) shall depend on the number of dwelling units for which Approvals (as defined in the Sale Agreement) have been obtained; provided, however, the minimum purchase price shall not be less than $15,700,000 unless the EGC Debtor exercises the Put (as defined in the Sale Agreement) in which case the Put Strike Price of $14,000,000 shall apply.

8.4    **Payment of Deposit**.  One day following expiration of the Due Diligence Period, if Purchaser has not terminated the Sale Agreement, Purchaser shall deliver the sum of Six Million Dollars ($6,000,000.00) (the "Deposit") to Land Services USA, LLC ("Escrow Agent") pursuant to

an escrow agreement mutually acceptable to the EGC Debtor, Purchaser and Escrow Agent.  Upon the occurrence of the Confirmation Date, the Deposit shall be non-refundable except in the event of an uncured Seller's Default (as defined in the Sale Agreement).  The Deposit shall be held in one or more interest bearing money market accounts; provided, however, that in lieu of a cash payment on account of the Deposit, Purchaser shall have the right to deliver to Escrow Agent an irrevocable letter of credit in a form substantially similar to that attached to the Sale Agreement or otherwise acceptable to the EGC Debtor, in the amount of the Deposit issued by M & T Bank or another bank with a net worth in excess of $10 billion whose deposits are insured by the FDIC, naming EGC Debtor as the beneficiary (the "Letter of Credit").  One day following the date the Confirmation Order becomes a Final Order, the Purchaser shall cause the Deposit, including any portion of the Deposit represented by a Letter of Credit, if any, to be converted into immediately available funds and paid immediately to the EGC Debtor to be used by the EGC Debtor to fund distributions under the Plan, provided that such disbursement may include, at Purchaser's option, a direct disbursement from the Deposit to those creditors of EGC Debtor who hold liens against the Real Property (Classes 1A Secured Claims of Property Tax Liens, 1B Secured Claims of PNC Bank and 2A Secured Claims of PNC Bank), in satisfaction of such liens, to assure that the Mortgage (as defined in the Sale Agreement) is a perfected first lien against the Real Property.  The Purchaser retains the right to replace the Letter of Credit with immediately available funds equal to the face amount of the Letter of Credit and, upon EGC Debtor's receipt of said funds it will return the Letter of Credit to the Purchaser.  The Deposit paid to EGC Debtor shall be credited against the Purchase Price and will be secured by a first mortgage lien on the Real Property subject to the terms and conditions of the Sale Agreement.  The EGC Debtor will utilize the balance of the Deposit to make the remaining payments required under the Plan to holders of Allowed Administrative Claims, Allowed Priority Tax Claims, the DIP Loan, Class 1C (Priority Non-Tax Claims against the EGC Debtor), Allowed Class 2B (Priority Non-Tax Claims against the ECC Debtor), Allowed Class 1D (General Unsecured Claims of the EGC Debtor), Allowed Class 2C (General Unsecured Claims of the ECC Debtor) and the balance to the holders of Class 1E (Interests in the EGC Debtor).  The EGC Debtor's entry into the Sale Agreement, the incurrence of the indebtedness thereunder secured by a mortgage against the Real Property, the issuance of the mortgage in favor of the Purchaser, the delivery of the deeds for the Real Property to the Purchaser, and the making of the lease between the Purchaser and the EGC Debtor in connection with the Retained Property are all transfers required under the terms and conditions of the Sale Agreement are hereby authorized under the Plan, and the Confirmation Order shall so provide without the need for any further corporate action and without the need of any further approval by the Bankruptcy Court.  The only conditions precedent to the funding of the Deposit are the expiration of the Due Diligence Period (which will occur prior to the Confirmation Hearing) without the Sale Agreement being terminated by the Purchaser and the entry of a Confirmation Order that becomes a Final Order.

8.5    **Sale of Real Property is Free and Clear of Liens, Claims and Interests**. Except as to the Purchaser's liability to pay the Purchase Price (as defined in the Sale Agreement) to the EGC Debtor, pursuant to 11 U.S.C. §§ 363 and 1123, the sale and transfer of the Real Property to the Purchaser upon the closing will be a legal, valid, and effective transfer of the Real Property (excluding the Retained Property) and vest the Purchaser with absolute right and title in and to the Real Property (excluding the Retained Property) free and clear of mortgages, security interests, conditional sale or other title retention agreements, claims of governmental entities (including but not limited to claims for taxes, real estate taxes, interest

22

and/or penalties), claims arising under bulk sales or similar laws, claims of the EGC Debtor's employees or employee benefit plans (including but not limited to claims for wages, salaries, commissions, vacation, severance, health or life insurance, or other employee benefits), charges, mechanics liens, pledges, liens, claims, judgments, demands, easements, charges, encumbrances, defects, options, restrictions of all kinds, any claims under any contract or statute, or in tort, that the Purchaser is the successor in interest to the business of the Debtors as it relates to the Real Property (excluding the Retained Property), any post-petition administrative claim in the Debtors' bankruptcy cases, and any other interest (including, without limitation, liens, claims, encumbrances, causes of action and interests (i) that purport to give to any party a right or option to effect any forfeiture, modification, or termination of the EGC Debtor's or Purchaser's interest in the Real Property (excluding the Retained Property), (ii) in respect of taxes, or (iii) which arise as a result of any employee benefit plan), whether matured, unmatured, contingent, liquidated or unliquidated (collectively, the "Liens and Interests") with all such Liens and Interests released, terminated and discharged as to the Real Property (excluding the Retained Property). Upon the closing, holders of such Liens and Interests shall be permanently enjoined from asserting such Liens and Interests against the Real Property (excluding the Retained Property) and the Purchaser.  All Liens and Interests shall attach to the proceeds of sale with the same extent, validity, and priority as they had with respect to the Real Property (excluding the Retained Property) prior to closing and shall be paid as provided by the Plan.

8.6     **Disbursements and Investment of Funds**.  All distributions under the Plan shall be made by the Disbursing Agent.  The Disbursing Agent may hold or invest funds in one or more accounts, provided that all investments shall be made in accordance with § 345(a) of the Bankruptcy Code.

8.7     **Final Decree.**  After consummation of the Plan and in the sole discretion of the Debtors, the Debtors shall file a motion to close these Chapter 11 Cases and request that a final decree be issued.

8.8     **Continued Existence of the Debtors**.  The EGC Debtor and the ECC Debtor will continue to exist after the Effective Date as corporations, with all the powers under applicable law in the jurisdiction in which each Debtor was formed and pursuant to their respective articles of formation and bylaws in effect prior to the Effective Date, except to the extent such articles of formation and bylaws are amended.

8.9     **Corporate Action**.  Each of the matters provided for under the Plan involving the structure of the Debtors or action to be taken by or required of the Debtors will, as of the Effective Date, be deemed to have occurred and be effective as provided herein, and will be authorized, approved and, to the extent taken prior to the Effective Date, ratified in all respects without any requirement of further action by the board of directors of the EGC Debtor or the ECC Debtor.

8.10    **Effectuating Documents and Further Transactions**.  The existing officers and directors of the EGC Debtor and the ECC Debtor, shall be authorized, to execute, deliver, file, or record such contracts, instruments, settlement agreements, releases, and other agreements or documents and to take or direct such actions as may be necessary or appropriate to effectuate, implement, and further evidence the terms, conditions and provisions of the Plan and the Sale

23

Agreement.  The secretary or any assistant secretary of each Debtor, as applicable, shall be authorized to attest any of the foregoing actions.

8.11    **Post-Confirmation Officer and Director; Compensation**.  The Debtors shall compensate Pam Mariani, the General Manager and a director of the Debtors, after the Effective Date in the same amount as during the course of these Chapter 11 Cases as follows: (a) wages in the gross weekly amount of $650.00[2] and (b) provide her with the normal and customary benefits provided to all management employees, which includes health insurance coverage.  The Debtors shall also compensate Peter Mariani, the Chief Financial Officer of the Debtors in the same amount as during the course of these Chapter 11 Cases as follows:  (a) provide Peter Mariani with the normal and customary benefits provided to all management employees, which includes health insurance coverage.  John Mariani who serves as a director of the Debtors with Pam Mariani will not be compensated.  The Debtors reserve the right to modify the compensation of these individuals as they deem appropriate in their sole business judgment.  The operations of the Debtors have been conducted and will continue to be conducted by Pam Mariani and Peter Mariani who have the direct responsibility for the planning, organization, direction and control of all levels of management and all phases of the business operations.  The Debtors reserve the right to change their officers and/or directors as they deem appropriate.

8.12    **Preservation of Insurance**.  Neither the Confirmation Order nor the occurrence of the Effective Date of the Plan shall diminish or impair (a) the enforceability of insurance policies that may cover Claims against the Debtors or any other person or entity,  or (b) the continuation of existing insurance programs in effect.  On the Effective Date, all insurance obligations, coverage, benefits and policies shall be deemed preserved, assumed and shall vest in the Debtors.

8.13    **Transactions under the Sale Agreement are Transfers Under the Plan.**  The conveyance of the Real Property to the Purchaser, the delivery of the deeds for the Real Property to the Purchaser (which may include the Retained Property if the subdivision of the Retained Property has not been completed at the time of closing), the issuance of the mortgage in favor of the Purchaser, the making of the lease between the Purchaser and the EGC Debtor in connection with the Retained Property and the conveyance of the Retained Property from the Purchaser back to the EGC Debtor (after subdivision approval of the Retained Property from the Real Property has been obtained) are all transfers required by the provisions of the Sale Agreement, the Plan and the Confirmation Order and shall constitute "transfers under a plan" within the purview of §1146(a) of the Bankruptcy Code and shall not be subject to transfer, stamp or similar taxes in accordance with such section.

8.14    **Exemption from Transfer Taxes.**  Pursuant to § 1146(a) of the Bankruptcy Code, the issuance, transfer or exchange of securities under the Plan and the Sale Agreement, the creation of the mortgage, or other security interests, the making or assignment of the lease, or the making or delivery of the deeds or other instrument of transfer under, in furtherance of or in connection with, the Plan, shall not be subject to any stamp, real estate transfer, mortgage recording or other similar tax imposed by any federal, state or local authority, including, without limitation, any tax imposed by the (a) Commonwealth of Pennsylvania, (b) Chester County, (c)

---

[2] The wages earned by Pam Mariani during the pendency of these Chapter 11 Cases have been accrued and will be paid to her on the Effective Date.

Delaware County (d) Willistown Township, and (e) Edgemont Township in connection with the Real Property and Retained Property owned by the EGC Debtor.  In order to effectuate the provisions of Section 1146(a) of the Bankruptcy Code, the Confirmation Order shall order and direct, to the extent necessary, the applicable Recorder of Deeds of Chester County and Delaware County to promptly record any deed(s) to the Real Property and Retained Property owned by the EGC Debtor which is being sold to the Purchaser pursuant to the provisions of the Plan.

8.15    **Execution of Documents Extinguishing Liens:**  The Reorganized Debtors shall have the authority and power to execute documents extinguishing Liens on behalf of those creditors whose Liens have been and will be extinguished pursuant to the Plan.

9**.**    **GENERAL PROVISIONS**

9.1    **Assumed Executory Contracts and Unexpired Leases**.    Each executory contract and unexpired lease identified on the attached Exhibit 8.1 and all policies of insurance, as amended, extended and/or renewed shall be deemed automatically assumed in accordance with the provisions and requirements of §§ 365 and 1123 of the Bankruptcy Code as of the Effective Date.  Entry of the Confirmation Order by the Bankruptcy Court shall constitute approval of such assumptions pursuant to §§ 365 and 1123 of the Bankruptcy Code.  Each executory contract and unexpired lease assumed pursuant to this Section 8.1 shall vest in and be fully enforceable by the Debtors in accordance with its terms, except as modified by (a) any written agreement between the Debtors and the respective counterparty, (b) the provisions of the Plan, or (c) any order of the Bankruptcy Court authorizing or providing for its assumption.  All written agreements between a Debtor and each respective counterparty that modify any executory contract or unexpired lease being assumed pursuant to this Section 8.1 shall be filed with the Court on or before the Confirmation Hearing.  The Debtors reserve the right to file a motion on or before the Confirmation Date to assume or reject any executory contract or unexpired lease.

9.2    **Rejected Executory Contracts and Unexpired Leases**.    Except with respect to (i) executory contracts and unexpired leases assumed as provided by Section 8.1 of the Plan and (ii) executory contracts and unexpired leases that have been previously rejected by order of the Bankruptcy Court, or are the subject of a motion to reject filed on or before the Confirmation Date, all other executory contracts and unexpired leases shall be deemed automatically rejected as of the Confirmation Date.  Entry of the Confirmation Order by the Bankruptcy Court shall constitute approval of the rejections contemplated herein, pursuant to §§ 365 and 1123 of the Bankruptcy Code.    The Debtors reserve the right to (a) file a motion on or before the Confirmation Date to reject any executory contract and/or unexpired lease and (b) modify or supplement Exhibit 8.1 at any time prior to the Confirmation Date.  Any counterparty to a rejected executory contract must be able to specifically identify items covered by any rejected executory contract as a condition precedent to the recovery of any such item and the removal of such item from the possession of the Debtors (or the Debtor, as the case may be).

9.3    **Payments Related to Assumption of Executory Contracts or Unexpired Leases**.  The provisions of each executory contract and/or each unexpired lease to be assumed under the Plan which are or may be in default shall be satisfied in a manner to be agreed upon by

the applicable Debtor and counterparty.  In the event of a dispute regarding (a) the nature or the
amount of any cure payment, (b) the ability of a Debtor to provide "adequate assurance of future
performance" (within the meaning of § 365 of the Bankruptcy Code) under the contract or lease
to be assumed, or (c) any other matter pertaining to assumption, these matters shall be
determined by the Bankruptcy Court.

9.4    **Rejection Damages Bar Date**.  If the rejection by a Debtor (pursuant to the Plan
or otherwise) of any executory contract or unexpired lease results in a Claim, then such Claim
shall be forever barred and shall not be enforceable against the applicable Debtor, or such
entities' Assets, unless a proof of claim is filed with the Bankruptcy Court and served upon
counsel for the Debtor within thirty (30) days after the earlier of (a) notice of the Confirmation
Order, or (b) other notice or order that the executory contract and unexpired lease has been
rejected; provided, however, that the foregoing requirement to file a proof of claim shall not be
applicable to any such Claim that was previously allowed by Final Order of the Bankruptcy
Court.

9.5    **Objections to Claims; Prosecution of Disputed Claims**.  Any Debtor may
object to the allowance of Claims filed with the Court and all objections to the allowance of
Claims shall be litigated to Final Order or compromised and settled, subject to approval of the
Bankruptcy Court after notice only to the applicable Debtor, the holder of such Claim, and
parties requesting notices in the case pursuant to applicable Bankruptcy Rules, and a hearing.
Failure to object to any Claim for purposes of voting on the Plan shall not be deemed a waiver of
the right to object to such Claim at any later date.

9.6    **Late Filed Claims.**  No objection shall be filed with respect to any proof of claim
filed after the Bar Date, and the holder of any such late filed proof of claim shall receive no
distribution under the Plan, except as specifically ordered by the Bankruptcy Court following a
motion filed by such Claimant, after notice to the applicable Debtor, counsel for the Debtor, and
such parties as the Court may direct, and a motion and hearing thereon.  Any such motion shall
be filed on or before the Effective Date or the holder of such Claims shall be forever barred and
all such Claims shall be discharged.  Nothing herein shall constitute a waiver by any Debtor of
any counterclaims, setoffs, or of any defenses with respect to such late filed proofs of claim,
including defenses as to the timeliness of the filing of such proofs of claim.

9.7    **No Distributions Pending Allowance**.  No payments or distributions will be
made with respect to all or any portion of a Disputed Claim unless and until all objections to
such Disputed Claim have been settled or withdrawn or have been determined by a Final Order
and the Disputed Claim becomes an Allowed Claim.

9.8    **Reserve for Disputed Unsecured Claims**.  On or after the Effective Date, the
applicable Debtor shall hold in the Disputed Unsecured Claim Reserve, cash in an aggregate
amount sufficient to pay each holder of a Disputed Unsecured Claim at the time distributions are
made, pursuant to the Plan, the amount of cash such holder would have been entitled to receive if
such claim had been an Allowed Claim on the Effective Date.  Cash withheld and reserved shall
be held until a determination is made on the allowance or disallowance of the Disputed
Unsecured Claim.  If the final determination of the Disputed Unsecured Claim results in the
Claim being allowed, its holder will be paid from the Disputed Unsecured Claim Reserve based

on the amount of its Claim that is allowed.  If the final determination results in the Disputed Unsecured Claim being disallowed, the cash reserved will be retained by the applicable Debtor. If practicable, the Debtors may invest cash in the Disputed Unsecured Claim Reserve in a manner that will yield a reasonable net return, taking into account the safety of the investment. Nothing herein shall be deemed to entitle the holder of a Disputed Claim to post-petition interest on such Claim.

9.9     **Estimation Period**.  The Debtors may, at any time after the Effective Date, request that the Bankruptcy Court estimate any unliquidated, contingent or Disputed Claim pursuant to §502(c) of the Bankruptcy Code, regardless of whether the Claim has previously been objected to.  In the event that the Bankruptcy Court estimates any unliquidated, contingent or Disputed Claim, the estimated amount may constitute a maximum limitation on such Claim, as determined by the Bankruptcy Court.  Notwithstanding this, the Debtors may elect to pursue any supplemental proceedings to object to the allowance and payment of such Claim.  All of the aforementioned Claims objection and estimation procedures are cumulative and not exclusive of one another.

9.10     **Distributions After Allowance**.  Payments and distributions to each holder of a Disputed Claim, to the extent that it ultimately becomes an Allowed Claim, will be made in accordance with the provisions of the Plan that governs distributions to such Claimants.

9.11     **Objection Deadline.**  As soon as is practicable, but in no event later than thirty (30) days after the Effective Date (subject to being extended by the Bankruptcy Court upon motion of the Reorganized Debtors), objections to Claims shall be filed with the Bankruptcy Court and served upon the holders of each Claim to which objections are made.

9.12     **Retention, Enforcement and Waiver of Claims.**  Pursuant to § 1123(b)(3) of the Bankruptcy Code, the Debtors shall retain and, shall have all requisite standing under the law, to initiate, continue or enforce any and all claims (both pre and post-petition) of the Debtors and/or the Debtors in Possession, including Causes of Action; provided, however, all Avoidance Actions shall be extinguished upon the completion of Distributions on account of Class 1D and Class 2C Claims.  All proceeds collected shall be used by the Debtors for their operations.

9.13     **Powers**. The Debtors shall have the right to settle, compromise, sell, assign, terminate, release, discontinue or abandon any Cause of Action from time to time in their sole discretion.

9.14     **Discharge of Debtors**.     Pursuant to § 1141 of the Bankruptcy Code, the distributions and rights that are provided in the Plan shall be in exchange for and in complete satisfaction, discharge, and release, effective as of the Confirmation Date (but subject to the occurrence of the Effective Date), of all Claims and Causes of Action, of any nature whatsoever, whether known or unknown, including any interest accrued on such Claims from and after the Petition Date, and Interests in the Debtors, their Assets, and the Debtors' Estates.   Except as otherwise provided in the Plan and § 1141 of the Bankruptcy Code, on the Effective Date (i) all Claims against the Debtors will be satisfied, discharged and released in full and (ii) all persons shall be precluded from asserting against the Debtors, the Estates, their successors, or their Assets, any other or further Claims based upon any act or omission, transaction, or other activity

of any kind or nature that occurred before the Effective Date.  Such discharge does not impair obligations created under the Plan.

9.15    **Discharge of Claims; Injunction**.  The rights afforded in the Plan and the payments and distributions to be made under the Plan shall be in complete exchange for, and in full satisfaction, discharge and release of, all existing debts and Claims of any kind, nature or description whatsoever against the Debtors, the Estates or any of their Assets, and upon the Effective Date, all existing Claims against the Debtors, the Estates and all of the Assets of EGC Debtor and the Assets of ECC Debtor will be, and be deemed to be, exchanged, satisfied, discharged and released in full; and all holders of Claims shall be precluded and enjoined from asserting against the Debtors, the Estates or their successors or their respective Assets, any other or further Claim based upon any act or omission, transaction or other activity of any kind or nature, whether or not the holder filed a proof of claim.

9.16    **Effect of Confirmation Order**.  Notwithstanding any contrary provision in § 1141 of the Bankruptcy Code, the Confirmation Order shall not be operative until the Effective Date and none of the occurrences described in § 1141 shall occur prior to such date.  Except as provided in §1141(d) of the Bankruptcy Code, the provisions of the Plan and the Confirmation Order shall bind the Debtors and all holders of Claims and Interests and will be a judicial determination of discharge of the Debtors from all debts that arose before the Confirmation Date and any liability on a Claim or Interest that is determined under § 502 of the Bankruptcy Code as if such Claim or Interest had arisen before the Effective Date, whether or not a proof of claim or interest based on any such debt or liability is filed under § 501 of the Bankruptcy Code and whether or not a Claim or Interest based on such debt or liability is allowed under § 502 of the Bankruptcy Code and whether or not such holder is impaired under the Plan and whether or not such holder has accepted the Plan, and shall terminate all rights, Interests and Claims of such holder, except as provided in the Plan.

9.17    **Automatic Stay**.  The automatic stay of § 362 of the Code shall remain in effect until the Effective Date.

9.18    **Modification and Amendments**.  The Debtors may alter, amend, or modify the Plan or any Exhibits thereto, under § 1127(a) of the Bankruptcy Code at any time prior to the Confirmation Hearing.  After the Confirmation Date and prior to substantial consummation of the Plan as defined in § 1101(2) of the Bankruptcy Code, the Debtors may, under § 1127(b) of the Bankruptcy Code, institute proceedings in the Bankruptcy Court to remedy any defect or omission or reconcile any inconsistencies in the Plan, the Disclosure Statement or the Confirmation Order, and such matters as may be necessary to carry out the purposes and effects of the Plan.  In the event that the Purchaser elects to not pay the Deposit to the EGC Debtor and proceed with the purchase of the Real Property pursuant to the provisions of the Sale Agreement, the Debtors reserve the right to modify the Plan to replace the Purchaser and the Sale Agreement.

9.19    **Right to Revoke or Withdraw**.  The Debtors reserve the right to revoke or withdraw the Plan at any time prior to the Effective Date.

9.20    **Effect of Withdrawal, Revocation, or Non-Consummation**.  If the Debtors revoke or withdraw the Plan prior to the Effective Date, or if the Confirmation Date or the

Effective Date does not occur, then the Plan, any settlement or compromise embodied in the Plan (including the fixing or limiting to an amount certain any Claim or Interest or Class of Claims or Interests), the assumption or rejection of executory contracts or unexpired leases effected by the Plan and any document or agreement executed pursuant to the Plan, shall be null and void.  In such event, nothing contained herein, and no acts taken in preparation for consummation of the Plan, shall be deemed to constitute a waiver or release of any Claims by or against or Interests in the Debtors or any other person, to prejudice in any manner the rights of the Debtors or any person in any further proceedings involving the Debtors, or to constitute an admission of any sort by the Debtors or any other person.

9.21    **Liability in Connection with Plan.**    Neither the Debtors or any of their respective attorneys, accountants, financial advisors, investment bankers or agents shall have, or shall they incur, any liability to any Creditor or person for any act or omission in connection with or arising out of their duties and participation in the Chapter 11 Cases, the administration of the Plan or the property to be distributed under the Plan, except for gross negligence or willful misconduct, and all such persons shall be entitled to rely upon the advice of counsel with respect to their duties and responsibilities under the Plan.  The foregoing shall not, however, affect the liability of the Debtors to any Creditor in connection with any Allowed Claim under the Plan; or shall the foregoing affect the liability of any party with respect to any act or omission that has occurred prior to the Petition Date.

9.22    **Exculpation**.  Neither, the Debtors or any of their officers, directors, shareholders, partners, employees, agents, members, professionals, counsel, financial advisors, investment bankers, or agents shall have, will have or incur any liability to any holder of a Claim or Interest for any act or omission in connection with, or arising out of these Chapter 11 Cases, the confirmation of the Plan, the consummation of the Plan or the administration of the Plan or the property to be distributed under the Plan except for willful misconduct or gross negligence.

9.23    **Remedy of Technical Defects:**  After the Effective Date, the Debtors may, with approval of the Bankruptcy Court, and so long as it does not materially and adversely affect the interests of any Claimant, remedy any defect or omission, or reconcile any inconsistencies in the Plan or in the Order confirming the Plan, in such manner as may be necessary to carry out the purposes and effect of the Plan.

9.24    **Surrender and Cancellation of Instruments:**  On the Effective Date, except as otherwise provided in the Plan, all promissory notes, instruments, securities and agreements evidencing a Claim shall be cancelled.  At the option of the Debtors, no payment hereunder shall be made to or on behalf of any holder of any Claim, unless and until such promissory note, instrument, security or agreement is surrendered or the unavailability thereof is reasonably established to the satisfaction of the Debtors and such holder of a Claim executes and delivers any documents necessary to release all encumbrances arising under any applicable security agreement or non-bankruptcy law and such other documents as the Debtors may reasonably request.  In accordance with §1143 of the Bankruptcy Code, any such holder of a Claim that fails to surrender or cause to be surrendered such promissory note, instrument, security or agreement or to execute and deliver an affidavit of loss and indemnity reasonably satisfactory to the Debtors shall be deemed to have forfeited all rights, claims and interests and shall not participate in any payment hereunder (to the extent otherwise entitled).

10.    **Conditions Precedent to Confirmation and Effective Date**.

10.1    **Conditions Precedent to Confirmation:**  The following are conditions precedent to confirmation of the Plan:

10.1.1  The Order approving the Disclosure Statement with respect to the Plan shall be in a form and substance acceptable to the Debtors.

10.1.2  The Due Diligence Period under the Sale Agreement shall have expired.

10.1.3  The Confirmation Order shall be in a form and substance acceptable to the Debtors.

10.2    **Conditions Precedent to the Occurrence of the Effective Date:**  The following are conditions precedent to the occurrence of the Effective Date:

10.2.1  The Confirmation Order shall have become a Final Order and shall not be subject to any stay or injunction;

10.2.2  The Purchaser shall have paid the Deposit to the EGC Debtor so that the EGC Debtor may make the distributions under the Plan.

10.3    **Waiver of Conditions to Occurrence of Effective Date or Confirmation.**  The Debtors may waive the conditions set forth in Sections 10.1 and/or 10.2 above without any notice to parties in interest or the Bankruptcy Court and without hearing.  The failure to satisfy or waive any condition to Confirmation or the Effective Date may be asserted by the Debtors in their sole discretion, regardless of the circumstances giving rise to the failure of such condition to be satisfied.  Failure of the Debtors, in their sole discretion, to exercise any of the foregoing rights shall not be deemed a waiver of any other rights, and each such right shall be deemed an ongoing right which may be asserted at any time.

[INTENTIONALLY LEFT BLANK]

11.    **OTHER INFORMATION**

Inquiries regarding information not contained in this Disclosure Statement may be made by contacting counsel for the Debtor, Aris J. Karalis, Esquire, Maschmeyer Karalis P.C., 1900 Spruce Street, Philadelphia, PA 19013, or the Clerk, United States Bankruptcy Court for the Eastern District of Pennsylvania, 900 Market Street, Suite 400, Philadelphia, PA 19106 (215) 408-2800.

**EDGMONT GOLF CLUB, INC.**

By: _/s/ Phyllis Ann Mariani (Pam)_
        Name:  Phyllis Ann Mariani
                   a/k/a Pam Mariani
        Title:    Director & General Manager

By: _/s/ John Mariani_
        Name:  John Mariani, Esquire
        Title:    Director

**EDGMONT COUNTRY CLUB**

By: _/s/ Phyllis Ann Mariani (Pam)_
        Name:  Phyllis Ann Mariani
                   a/k/a Pam Mariani
        Title:    Director & General Manager

By: _/s/ John Mariani_
        Name:  John Mariani, Esquire
        Title:    Director

**MASCHMEYER KARALIS P.C.**

By: _/s/ Aris J. Karalis_
        ARIS J. KARALIS
        1900 Spruce Street
        Philadelphia, PA  19103
        215-546-4500
        Attorneys for the Debtor

Dated: February 27, 2015

## LIST OF EXHIBITS
## TO DISCLOSURE STATEMENT

Exhibit 5.1          Liquidation Analysis for the EGC Debtor and ECC Debtor

(To be supplied prior to the hearing to consider approval of the Disclosure
Statement)

Exhibit 5.2          Sources and Uses of Funds as of the Effective Date

(To be supplied prior to the hearing to consider approval of the Disclosure
Statement)